WALTER v. McCLELLAN, Mayor, et al.

(Supreme Court, Appellate Division, First Department. May 11, 1906.)

1. MUNICIPAL CORPORATIONS — WATER SUPPLY — AQUEDUCT COMMISSIONERS — POWERS—CONSTRUCTION OF DAM—LOCATION OF DAM.
    Laws 1883, p. 666, c. 490, § 2, authorizes the commissioner of public works, under the direction of the aqueduct commissioners, to submit plans for the construction of a new aqueduct for water from some point on the Croton river or Croton Lake to some point in the city of New York and for the construction of one or more dams or reservoirs to retain such water, etc. Section 36, p. 678, as amended by Laws 1887, p. 229, c. 196, gives the city authority to construct highways and bridges as may be made necessary by the construction of any reservoir in the counties of Westchester or Brooklyn. Held, that the aqueduct commissioners were not required to locate dams or reservoirs upon the Croton river or Lake, but had power to build a dam in the county of Westchester on a tributary of the Croton river.

2. SAME—LIFE OF BOARD OF COMMISSIONERS.
    Laws 1883, p. 666, c. 490, created the board of aqueduct commissioners and authorized them to provide new reservoirs, dams, and an aqueduct for the purpose of supplying the city of New York with water. Laws 1897, p. 182, c. 378, § 518, provided that the aqueduct commissioners should not begin any new work and that their term of office should end on June 1, 1901. This, however, was amended by Laws 1899, p. 691, c. 313, so as to provide that the term of office of the commissioners should cease on completion of the work then on hand. Laws 1901, p. 231, c. 466, contained practically the same provision as to term of office of the commissioners, and Laws 1905, p. 2026, c. 723, § 8, provided that nothing therein should be construed as affecting the acquiring of lands by the aqueduct commissioners under the statute of 1883. After the aqueduct was built and certain dams and reservoirs had been completed, the water supply was still insufficient to exhaust the capacity of the aqueduct or satisfy the requirements of the city. Held, that thereafter and later than 1901, the aqueduct commissioners still had power to contract for the construction of a further dam.

3. SAME—LETTING OF CONTRACT—UNIT BIDS ON DIFFERENT KINDS OF WORK.
    The aqueduct commissioners created by Laws 1883, p. 666, c. 490, in obtaining bids for the construction of a dam proceeded properly in submitting itemized estimates of the amount of various kinds of work and material which they believed would be required, stating that all such estimates were not binding on the city, but that each bidder would be required to investigate and decide for himself as to the quantity of labor and material which would be required and asking for bids at unit prices instead of for the whole contract at a lump sum.

**4. SAME—ACCEPTANCE OF BID.**

Laws 1883, p. 666, c. 490, creates the board of aqueduct commissioners and authorizes them to procure the construction of an aqueduct and dams or reservoirs. The board was authorized in awarding contracts to accept the bid which would in their judgment best secure the efficient performance of the work. After part of the system was constructed it became necessary to erect another dam at the cost of about a million and a quarter dollars. It was necessary that this dam be constructed as rapidly as possible because of a shortage in the water supply. *Held*, that the commissioners were justified in awarding the contract to a bidder whose bid was $166,000 higher than the lowest bid, it appearing that the engineers of the board recommended the bidder as being best equipped to execute the contract promptly, and that the bid was considerably less than the highest bid, and below the estimate of the engineer.

Appeal from Special Term.

Action by Frederick Walter against George B. McClellan, mayor, and others. From a judgment for defendants, plaintiff appeals. Affirmed.

See 96 N. Y. Supp. 479.

Argued before O'BRIEN, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and HOUGHTON, JJ.

John C. Wait, for appellant.

Chase Nellen, for respondents MacArthur Bros. Co. and Winston & Co.

Terence Farley, for respondents aqueduct commissioners.

McLAUGHLIN, J. On the 21st of June, 1905, the city of New York, acting by and through the aqueduct commissioners under the power vested in them by chapter 490, p. 666, of the Laws of 1883, and the amendments thereto, entered into a contract with the respondents MacArthur Bros. Company and Winston & Co., by which the latter agreed to build a reservoir and dam at Cross river, in the county of Westchester, according to certain plans and specifications annexed to and made a part of the contract, for the consideration expressed therein. Prior to the making of the contract the aqueduct commissioners duly advertised for 15 consecutive days, commencing May 10, 1905, for sealed bids for the work. The notice published, notifying bidders, was quite minute in regard to the various details connected with the proposed work, the time when the same must be commenced and finished, together with a statement based upon the estimate of the engineer of the aqueduct commissioners of the approximate quantities of work to be done and materials to be furnished, which statement was divided into 49 different items. The bidders were notified that the quantities were approximate only, being given as a basis for the uniform comparison of bids, and that the commissioners did not, expressly or by implication, agree that the actual amount of the work would correspond therewith, but reserved the right to increase or diminish the quantities of any classes or portion of the work as might be deemed necessary by the engineer. The bidders were required to satisfy themselves by personal examination of the location of the proposed work, and by such other means as they might prefer as to the accuracy of the estimates, and that they could not at any time after the submission of an estimate dispute or complain of such statement or estimate of the

engineer, nor assert there was any misunderstanding in regard to the nature or amount of the work to be done. Special attention was called to the uncertainty as to the total quantity of rock to be excavated to prepare a foundation for the dam, since that would depend upon the character of the rock and the number of seams and other defects which could not be determined in advance. Also that the quantity of masonry to be built was liable to vary from the estimates for the same reason. In pursuance of the advertisement, seven bids were received, which, on the 31st of May, 1905, were opened, and the chief engineer of the acqueduct commissioners was directed to tabulate the same, the result of which showed a difference of $263,711 between the highest and lowest bid; the highest being $1,344,030 and the lowest $1,080,319. The chief engineer's estimate of the cost of the work was $1,315,000. The bid of the respondents MacArthur Bros. Company and Winston & Co. was $1,246,211.60, and which was $165,892.60 more than the lowest. The chief engineer of the aqueduct commissioners was thereupon directed to make a report as to the financial standing of the bidders, including plants and ability to do the work, and each bidder was required to furnish the engineer with the requisite information bearing on such subjects. This direction, however, was subsequently modified by omitting the requirement as to financial ability and such inquiries were made by the comptroller. Different reports were thereafter made by the chief and consulting engineers of the aqueduct commissioners, the comptroller, and assistant engineers of the department of finance, which were finally considered and passed upon on the 20th of June, when a resolution was passed by the aqueduct commissioners to the effect that the bid of the respondents MacArthur Bros. Company and Winston & Co. was the one, the acceptance of which would, in the judgment of the commissioners, "best secure the efficient performance of the work," and on the following day the contract was let to them, and they immediately thereafter entered upon the work. Thereupon the plaintiff, as a taxpayer, brought this action to restrain the commissioners and the other defendants from proceeding under the contract, upon the ground that the same was illegal and the expenditure of money under it would constitute a waste of public funds. The action subsequently came to trial upon the answers interposed by the different defendants, and at its conclusion the complaint was dismissed upon the merits, and plaintiff appeals.

He attacks the judgment principally upon the ground that the contract entered into with MacArthur Bros. Company and Winston & Co. is illegal (1) because the reservoir and dam proposed to be built would not be located in the territory over which the aqueduct commissioners had jurisdiction; (2) because the aqueduct commissioners had no power at the time the contract was made to build a reservoir and dam, inasmuch as that power was lodged in the department of water supply, gas, and electricity; (3) because the character, location, extent, and quantity of materials and work which may be required by the contract are not specified, limited, or stated in the contract, nor is the liability of the city of New York determined by the contract, specifications, and plans; (4) because there was no such standard of comparison set forth in the notice to contractors and the advertisement

as the law and competitive bidding require; and (5) that the award of the contract to MacArthur Bros. Company and Winston & Co., at a price of $165,892.60 above the lowest bidder, was an act forbidden by article 3, § 28, of the Constitution of the state of New York. The aqueduct commissioners had the power under chapter 490, p. 666, of the Laws of 1883, and the amendments thereto, to enter into the contract. This act is entitled:

"An act to provide new reservoirs, dams and a new aqueduct with the appurtenances thereto, for the purpose of supplying the City of New York with an increased supply of pure and wholesome water."

Section 2 authorizes the commissioner of public works, under the direction of the aqueduct commissioners, to submit a plan or plans, together with maps, specifications, estimates, and particulars relating thereto, for the construction of a new aqueduct or conduit for water from some point on the Croton river or Croton Lake to some point in the city of New York, and for the construction of one or more dams and reservoirs to retain such water, and for the construction of such sluices, culverts, canals, pumping works, bridges, tunnels, etc., as may be necessary to the proper construction, maintenance, and operation of the aqueduct, dams, and reservoirs. The aqueduct commissioners, by this section, are authorized to adopt, modify, or reject any such plan or plans, and in their discretion to cause surveys to be made, etc. Throughout the act the words are continually used viz., "aqueduct," "dams," "reservoirs," etc. There is nothing in the act nor any of the amendments to indicate that the Legislature intended to limit the location of the dams and reservoirs to the Croton river. The only limitation is that the aqueduct which is to carry the water collected in the reservoirs shall begin at some point on the Croton river or Lake, and end at some point in the city of New York. Section 36, p. 678, of the act, as amended by chapter 196, p. 229, of the Laws of 1887, clearly indicates a legislative intent not to limit the location of dams and reservoirs to the Croton river, because authority is there given to the city to construct highways and bridges as may be made necessary "by the construction of any reservoir in the county of Westchester or county of Putnam under this act." The dam proposed to be built is in the county of Westchester, on a tributary of the Croton river, and where the aqueduct commissioners have the power to build a dam.

It is also urged that the aqueduct commissioners had no authority to project or undertake new work, but only to complete work which had been commenced prior to January 1, 1901. The argument in this respect is based upon certain sections of the Greater New York Charter. Section 518, c. 378, p. 182, Laws 1897; chapter 313, p. 691, Laws 1899; section 518, c. 466, p. 231, Laws 1901. Section 518 of chapter 378, p. 182, of the Laws of 1897, provided that the aqueduct commissioners should not begin any new work and that the term of office of the commissioners then in office should terminate and cease on January 1, 1901. This section, however, was amended by chapter 313, p. 691, of the Laws of 1899, so as to provide that the term of office of the commissioners should cease and determine on completion

of the work then on hand. This section was further amended by chapter 466, p. 231, of the Laws of 1901, by providing that:

"Nothing in this act contained shall be deemed or construed to repeal or in anywise affect chapter 490 of the laws of 1883 * * * or the several acts amendatory thereof. * * * The term of office of the commissioners appointed and existing under the aforesaid Act shall cease and determine on the completion of the work and thereupon all papers * * * shall be delivered to the commissioner of water supply, gas and electricity."

In this connection it is to be noted that section 8 of chapter 723, p. 2026, of the Laws of 1905, which provides for the establishment of a water commission and the storage of water in certain sections of the state, also provides that:

"Nothing herein contained shall in any way affect the acquiring of lands by the aqueduct commissioners of the city of New York under the provisions of chapter 490 of the Laws of 1883, as heretofore amended."

The act of 1905, of course, has no application to the question here presented, except in so far as it indicates that the Legislature recognized that the work of the aqueduct commissioners had not, at the time of the passage of that act, been completed.

In view of the foregoing provisions of this statute, I do not think it can be successfully contended that the construction of the proposed dam and reservoir is new work, or that the office of the aqueduct commissioners with reference to it had, at the time the contract was made, been terminated, and the power theretofore lodged in such commissioners been transferred to the commissioner of water supply, gas, and electricity. The act of 1883, as its title indicates, was to enable the city of New York to acquire, by the construction of an aqueduct extending from the city to Croton river, a supply of pure and wholesome water sufficient to meet the needs of the city, and for that purpose to construct necessary dams and reservoirs for the retention of water. The plan contemplated has been partially completed. The aqueduct has been built as well as certain dams and reservoirs, but sufficient water has not yet been retained to exhaust the capacity of the aqueduct. The dam in question is but a part of the same plan designed for the retention of water to be carried through the same aqueduct. It cannot, therefore, be said to be new work, but is a mere incident to the work begun under the act of 1883, and which the statute permits the aqueduct commissioners to complete.

If the foregoing conclusions be correct, then substantially the only question remaining to be considered is whether the contract asking for bids at unit prices for doing the work and furnishing the materials, and which might be increased or diminished as the work progressed, based upon an estimate of quantities, was one which the aqueduct commissioners had the power to make. There was no way, according to the uncontradicted testimony of the engineers, by which it could be accurately determined, when the contract was let, the exact amount of work or materials which would be required. The contract had to be let in one, of two ways—either for a lump sum, which would require the contractor to do all the work for a given amount, or else for a specified price based upon estimated quantities by which the contractor agreed to do all the work for separate prices bid by him per unit of measurement,

and it is difficult to see why one method is any more advantageous to the city than the other. Indeed, both methods have been adopted, and the legality of either has not, so far as I have been able to discover, heretofore been challenged. The former was approved in Lentilhon v. City of New York, 102 App. Div. 548, 92 N. Y. Supp. 897, and the latter in O'Brien v. Mayor, 139 N. Y. 543, 35 N. E. 323.

In the O'Brien Case the contract provided for payment by items and units of measurement, and contained substantially, in those respects, the same provision, and was entered into by the aqueduct commissioners under the same statute, as the contract here under consideration. Commenting upon this feature of the contract, Judge Peckham, who delivered the opinion, said:

"A perusal of the contract itself, as shown by the analysis already herein set forth, shows that it was drawn to provide for all the work of every kind and description which should be called for in the course of the building of this aqueduct, and for all such work and for the furnishing of all the necessary materials the contract provided special prices should be paid. Extra work or work outside of the character or amount of that specified in the contract was provided for and a way pointed out which was to be followed in order to bind the defendant."

In the contract now under consideration the obligation on the part of the city, including the method of payment to the contractor, is just as definite and fixed as it was in the contract in the O'Brien Case. There is no material difference in this respect between the two contracts. Bidders here were informed, as already indicated, that the engineer, after having examined the site of the dam by means of borings, test pits, etc., had made an estimate of the nature and extent as nearly as practicable of the work required, and that the several bids would be tested by the quantities and kinds of work mentioned in the estimate. The estimate divides the work into 49 different items, consisting of excavations of different classes, refilling, timber, cement, concrete blocks, masonry of different classes, steel and cast iron pipes, valves, culverts, and other work. Bidders were told that the quantities were approximate only, the same being given as a basis for uniform comparison of bids, and that the commissioners did not, expressly or by implication, agree that the actual amount of work to be done or materials to be furnished would correspond with the estimates, but that they reserved the right to increase or diminish the quantity of any class, if deemed necessary by the engineer in charge of the work. This was a wise provision, and would seem to be almost necessary in order to properly protect the interest of the city. This reservation did not mean that the commissioners could arbitrarily increase or diminish the quantities without regard to the actual amount of work or materials necessary to build the dam and reservoir. On the contrary, it was to protect the city against claims for loss of profits in case the estimated quantities were in excess of the amount actually required, and from claims for damage in case the actual quantities exceeded the estimates. In other words, the city, while it had taken every means known to ascertain in advance the actual situation, declined to guaranty the correctness of the estimates of the engineers, but left it to the bidders to satisfy themselves by a personal examination, and other means, as to just what

would have to be done in order to complete and carry out the proposed contract. Under such circumstances it is not at all surprising that the bids should vary, because each would depend upon the judgment of the person making it as to the accuracy of the estimated quantities. The bidders, however, were all placed in the same position. They all had, or could have obtained, the same information. They knew what would be required and what would have to be done in order to comply with the contract, and for which they would be paid a stipulated price. This furnished just as much a standard of comparison as would bids for a lump sum. One bidder might have greater intelligence than another, and to this extent have an advantage, but, if the work had been let for a lump sum, he would have had the same advantage, and this advantage is the reward which intelligence always brings. The fact that MacArthur Bros. Company and Winston & Co. made a nominal bid on certain items does not subject them nor the aqueduct commissioners to any criticism. The reasons which induced them to make such bids was a matter purely personal to themselves. They may have thought the estimates in those respects were erroneous, and the materials and work called for by these items would not be required. If they were in error, nobody was injured except themselves. There is nothing to indicate that there was any collusion between the successful bidder and the chief engineer of the commissioners. The conclusion of the Trial Court in this respect is not only sustained by the evidence, but any different conclusion would be against evidence.

Finally, it is claimed that the contract is invalid because it provides for the payment to the contractors of $165,892.60 in excess of the lowest bid, which, in effect, is a gift to them to this extent of public moneys which is prohibited by the Constitution of the state. It is true, as already stated, that the bid of the persons to whom the contract was let exceeded, by the amount above stated, a lower bid, but the act of 1883 did not require the aqueduct commissioners to let contracts to the lowest bidder. On the contrary, they were authorized to accept the bid "which will, in their judgment, best secure the efficient performance of the work." Here time was of the essence of the contract. The city was short of water and the contract contemplated that work involving the expenditure of upwards of a million of dollars should be done in a short time. The ability, therefore, of a contractor to do the work and fully perform the terms of his contract, was a very important consideration. The testimony shows that the aqueduct commissioners took this into consideration, and exercised unusual care in passing upon the bids. The engineers reported in favor of the ones to whom the contract was finally awarded, presumably because they had had experience in doing similar work and were prepared, so far as equipment was concerned, to immediately enter upon its prosecution. Besides, their bid was only about $60,000 higher than the average bid; was under the estimate of the chief engineer as to the cost of the work; and was considerably less than the highest bid, which was made by the only other person who had had actual experience in building works of this character.

Other questions are raised in the appellant's brief, but they seem to by incidental to and disposed of by the ones already discussed.

The judgment appealed from is right, and should be affirmed, with costs. All concur.