Manhattan Security Corporation, Plaintiff, *v.* John H. Delaney and Others, Constituting the Board of Transportation of the City of New York; James J. Walker and Others, Constituting the Board of Estimate and Apportionment of the City of New York, and Corson Construction Corporation, Defendants.

Supreme Court, New York County, March 9, 1929.

*Foley & Martin,* for the plaintiff, for the motion.

*George P. Nicholson, Corporation Counsel [Joseph L. Pascal* of counsel], for city of New York and board of estimate and apportionment, opposed.

*Bandler, Haas & Collins [John F. Collins, Harry Merwin* and *Mortimer DeGroot* of counsel], for defendant Corson Construction Corporation, opposed.

*Ralph R. Monroe,* for board of transportation, opposed.

LEVY, J. This is a taxpayer's action to restrain the city of New York and its transit authorities from entering into contracts with defendant Corson Construction Corporation for the construction of sections 1 and 2 of rapid transit route 103. This route is an extension of the Sixth avenue subway now under construction, and is intended to serve the lower east side of the borough of Manhattan, and to form a link in extensions to the borough of Brooklyn. The plaintiff here is a corporation, whose president is also the president of another corporation, the second lowest bidder, and an injunction *pendente lite* is sought. Defendant Corson is the lowest bidder on each of the two sections, as well as on the combined route, its aggregate bid being $14,160,082. The other bidders in order of the amounts are Atwell, Gustin, Morris, Inc., $14,851,439; Rosoff Tunnel Corporation, $15,070,205.75; Oakdale Contracting Co., Inc., $16,841,918; George H. Flinn Corp., $17,229,742.25; Rodgers & Hagerty, Inc., $17,752,761.25; Marcus Contracting Co., Inc., $19,984,574. Obviously, the difference between the Corson and the Atwell bids is nearly $700,000.

The first grievance is that the defendant bidder deposited $50,000 on its bid for sections 1 and 2, and made this deposit to cover bids for the separate sections as well, whereas other bidders, to secure consideration for their bids on separate sections, were compelled to deposit an additional $50,000. It appears, however, in the answering affidavits that the Corson bid was for the combined sections only, and the consideration of its bid for the separate sections was held in abeyance, subject to the opinion of the board of transportation. But even assuming that the deposit was inadequate, the illegality of the bid cannot be contested by a taxpayer, unless its acceptance results in waste to the city. (*McCord*

v. *Lauterbach,* 91 App. Div. 315.) An attempt is made to show this by the argument that the unfair advantage gained by the Corson company interfered with free competition and thus resulted in public detriment. If there were any showing that other contractors had attempted to make deposits under similar conditions and had been denied such opportunity, the situation might support the charge. But in the absence of such facts, the alleged unfair advantage plays no part in the award and cannot be said to result in possible waste to the city, directly or indirectly.

The second grievance, and the one that requires more serious consideration, is that the Corson company presented a bid that was improperly balanced; that some of its items represented nominal prices, while others were grossly inflated; so that the net effect is a bid which, while ostensibly the lowest, will in reality work a waste of public moneys. Particular reference is made to the nominal bid of one cent per lineal foot for timber on the one hand, and what is characterized as the excessive estimate of the cost of demolition of buildings on the other. The invitation to the bidders contained the provision that " the Unit Prices must not be improperly balanced and any bid which the Board considers detrimental to the City's interests may be rejected." In *Walter* v. *McClellan* (48 Misc. 215; 113 App. Div. 295; 190 N. Y. 505) an " unbalanced " bid was described as a " bid based upon nominal prices for some work and enchanced prices for other work. Such a bid is not *per se* fraudulent nor unlawful, and where, as here, there is shown to have been no material enhancement of the gross price, and the items are fairly identified, the contract is not reasonably assailable. (*Reilly* v. *Mayor,* 111 N. Y. 478; *Matter of Anderson,* 109 id. 554.)" A good illustration of an unbalanced bid which bore the earmarks of fraud and illegality is found in *Matter of Anderson (supra).* There the contractor whose offer was accepted bid one dollar and sixty-two and one-half cents per yard for earth excavation and two cents per yard for rock excavation. The estimated quantities submitted to the bidders were 10,000 cubic yards of earth and 20,000 cubic yards of rock. It turned out in the course of the work that there were actually 20,576 cubic yards of earth and 9,241 cubic yards of rock. As a result the contractor was actually paid nearly twice as much as the amount of his aggregate bid based on estimated quantities. The court's comments upon this situation, at page 558, were as follows: " We are also of opinion that upon the facts of the case it is a just inference that the contract was the result of fraud and collusion. Fraud is suggested by the careless and reckless way in which the

estimates were made, without any adequate test or examination to ascertain the quantity or character of the different kinds of materials. An estimate of the quantity of rock at more than double the actual quantity, and the amount of earth at less than half the actual quantity, taken in connection with Kane's extraordinary unbalanced bid, could hardly have been the result of accident. The bid on its face is suggestive of fraud. The officers of the city, when they saw in the bid two cents per cubic yard for rock excavation, and $1.62½ for earth excavation, ought to have known, and must have known if they read it, that some fraud was contemplated; and it may be inferred that when the contract was let there was actual fraud and collusion between the bidder and the representatives of the city, as the city could not have been compelled to enter into contract upon such a bid."

The fundamental vice in that case was not so much the unbalanced bid as the failure of the city to make any investigation of its own estimates of quantities, and its reliance upon the merest conjecture. On the other hand, in *Reilly* v. *Mayor* (*supra*) there was a preliminary survey, but it was carelessly made. The good faith of that estimate was not assailed, but only its accuracy. The court refused to hold that contract fraudulent, saying (at p. 478): "It does not appear that the contractor influenced that estimate, or knew anything about it when it was made; and the only allegation as to him is that he knew the estimate to be erroneous, and, relying on his own judgment, made an unbalanced bid which gave him the contract as the lowest bidder, while the result of the work showed that he was not such. That state of facts fails to establish a fraud; for, the innocence of the surveyor being conceded, and the absence of any collusion between him and the contractor — which in the *Anderson* case was a possible and reasonable inference — the charge of fraud rests only on the fact that the contractor had a more accurate knowledge of quantities than the surveyor, and 'in bad faith' made his bid. Calling names does not alter facts. The contractor had a right to the benefit of his own knowledge honestly acquired, so long as he did nothing to mislead or deceive the city, and there was no bad faith either in the acquisition of his knowledge, or the use of it in guiding his bid. On the contrary, the terms of the contract warned him that the estimates might not be correct, and left him to judge in that respect and at his own peril in making his bid."

Effect must, of course, be given to the terms of the invitation to bid in which it was provided that unit prices must not be improperly balanced. Was this inhibition violated? The bid on item 12 at one cent per lineal foot is undoubtedly nominal. The

proposals for items 1, 6, 7 and 19 complained of, while low, are not so low as to indicate that no profit has been included in the proposed prices. There appear to be no items with exorbitant unit prices to counterbalance or offset these, so as to constitute an unbalanced bid within the meaning of the expression employed in the invitation. The charge, in fact, is that in the *fixed* items of demolition of buildings, items 128 DK to 128 DL, the Corson company has made an estimate of over $600,000 in excess of the second bidder. It is, therefore, argued that the overcharge more than absorbs the nominal bid on item 12. If that be so and the estimate for demolition is unconscionable and wasteful of the city's funds, it requires close scrutiny, apart from the question of the lack of balance. But the difficulty is that it is not so. The Corson estimate for demolition is by no means the highest. The proposals of three other bidders contained estimates far in excess. In the opposing affidavits a cost of $700,000 for this item is indicated. While the profit may be high it is not such as to result in a " material enhancement of the gross price." (*Walter* v. *McClellan, supra.*) There is no requirement in law of uniformity in the scale of profit on the different items. Such a rule might result in disadvantage to the city; for one contractor might, by reason of special facilities or particular experience, be in a position on a given item to bid much lower than the cost to others. In the aggregate, the Corson bid is $700,000 lower than that of its next competitor. If it has estimated a profit of $300,000 too much on the demolition work and that item should be accordingly reduced, its bid would be $1,000,000 lower than that of the Atwell concern. No charge of fraud, of course, can be predicated on the fact that the successful bidder is only $700,000 below the next, instead of $1,000,000 or possibly more.

But there remains to be considered the accusation that the Corson concern will obtain an unfair advantage under its high bid for demolition for the following reasons: It is alleged that this work will come first; that the contractor will, therefore, secure early payment for work done under a high estimate; and that this payment will include compensation for excavation of cellar and vault space, the work on which will be negligible. In answer to this it is shown that the work of demolition cannot be begun until many months have elapsed; that the city's chief engineer will only certify payments for excavations of cellar space when the area immediately adjoining has been excavated and when the foundations have been excavated to the depth required; and that the work on foundation walls of cellars and vaults is generally quite expensive, and the usually vacant space is filled with debris which has to be

removed. In addition, attention is called to the fact that the contractor must furnish a bond of $1,425,000 to the city, $600,000 to the New York Rapid Transit Corporation, and $300,000 to the Interborough Rapid Transit Company. Besides, it may be assumed that the financial responsibility of the successful bidder is closely scrutinized before the award is made.

On the whole, plaintiff has failed to show that the Corson bid is fraudulent, wanton or reckless, and that its acceptance will result in waste to the city. The affidavits of the city and its transit authorities and particularly that of the chief engineer, whose long and honorable connection with city work entitles his opinion to respectful weight, indicate a conscientious effort to perform a difficult task to the best advantage of the taxpayers.

The motion is, therefore, denied.