(No. 88-CC-3663–

R. W. DUNTEMAN CO., Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed January 6, 1999.*

*Supplemental opinion filed May 14, 1999.*

*Order filed July 15, 1999.*

BARNES & THORNBURG (BRADLEY B. FALKOF, of counsel), for Claimants.

JANICE SCHAFFRICK, for Respondent.

## OPINION

FREDERICK, J.

This cause comes before the Court on Claimant, R. W. Dunteman Company's, verified complaint alleging breach of contract by the Illinois Department of Transportation for its failure and refusal to pay R. W. Dunteman Company for topsoil furnished and placed at a construction site at the agreed upon unit price of $23 per square yard. Hereafter in this opinion, Claimant will be referred to as "Dunteman" and the Illinois Department of Transportation will be referred to as "IDOT."

The topsoil was to be provided pursuant to contract no. 41432 in relation to the construction of road improvements near the City of Lisle (hereinafter referred to as the "Warrenville Road Project"). The verified complaint requests $496,505.60 in damages based upon its bid of a unit price of $23 for topsoil placement for 3,020 square yards of topsoil. The sum sought is now stated at $496,514.80.

Respondent, State of Illinois' answer admits that the Contract Schedule of Prices indicates that Claimant bid a unit price of $23 on bid item no. 216003, estimated by the Department at 3,020 *square* yards, however, the project plans and cross-section plans which were part of the contract required 3,020 *cubic* yards. Respondent answers that the clear purpose and intent of contract no. 41423 was for Claimant to provide 3,020 *cubic* yards of topsoil.

The primary issue in this case is what quantity of topsoil was required by the contract between Claimant and Respondent.

The summary of quantities, the contract schedule of prices, and the proposal form to be used by contractors bidding indicate that 3,020 *square* yards were necessary for the Warrenville Road Project. The cross-sections contain drawings and measurements by which one could compute the topsoil needs to be 3,020 *cubic* yards or 27,180 square yards. The project actually required 3,020 cubic yards of topsoil.

Dunteman bid a unit price of $23 a square yard for the topsoil. Its bid on the entire project was $2,010,848.15. Dunteman has heretofore received $2,170,423.91 in payments, and if it collects the $496,514.80 claimed, will have received $2,666,938.71. The Department's own three prebid estimates for the total project were: $2,684,422; $3,045,680; and $2,638,248.92.

The parties have stipulated that Dunteman actually delivered 24,286 square yards of topsoil and has been paid $62,063.20 for the topsoil. Dunteman seeks an additional $496,514.80 (21,587.60 sq. yds. × $23). The topsoil was placed between October 9 and October 21, 1986.

There is evidence that Respondent's agents had actual knowledge at the time the project was designed and

at the time the plans and specifications and bid documents were being assembled that approximately 27,180 square yards of topsoil were needed. Although there is no direct evidence that unequivocally shows that Claimant's agents had actual knowledge that the project needed approximately 27,180 square yards of topsoil, knowledge by Claimant that the project needed substantially more than 3,020 square yards is presumed because Claimant's president refused to answer the direct question during the April 1996, hearing. Such knowledge may also be constructively attributed to Claimant because the cross-sections of the plans indicate that substantially more than 3,020 square yards of topsoil were required. The Court can find that as a matter of law both parties had actual and constructive knowledge that the project required approximately 27,180 square yards of topsoil. The important question of when such actual or constructive knowledge was obtained remains.

Procedural Background

This cause came before the Commissioner for a three-day trial commencing on March 28, 1994.

The Commissioner ruled prior to the trial that evidence of Dunteman's losses on the Warrenville Road Project which were caused by fluctuations in the quantity of pay items other than topsoil were inadmissible. Dunteman indicated that it was prepared to prove that Dunteman had an aggregate loss on the Warrenville Road Project in the amount of $411,187.35 on pay items other than topsoil. Unit prices for pay items other than topsoil were not renegotiated despite quantity fluctuations which impacted the initial contract value by $504,913.45.

The Commissioner also ruled that evidence that would support Respondent's affirmative defenses

grounded upon equitable remedies would not be admissible.

On October 26, 1995, the Court entered an order remanding this case for the purpose of hearing evidence on the issue of profit and loss on the overall contract, the fairness of Claimant's bid, and Claimant's losses caused by the fluctuations in the quantity of pay items other than topsoil. The order also specified that evidence in regard to equitable defenses should be heard by the Commissioner.

## The Facts

On or about May 21, 1986, Dunteman contracted with IDOT to reconstruct and widen Warrenville Road, Route 53 and Middleton Avenue, and perform related work, in DuPage County, Illinois. Joint trial exhibits comprise contract documents between Dunteman and IDOT. Joint exhibit 1E is the Department's agreement with the Village of Lisle (hereinafter referred to as "Lisle") which employed Lisle to administer and supervise the Warrenville Road Project on behalf of IDOT. Joint exhibit 1F is Lisle's agreement with the consulting firm of Barton-Aschman & Associates (hereinafter referred to as "Barton-Aschman") which employed Barton-Aschman to administer and supervise the Warrenville Road Project on behalf of Lisle, including the preparation of plans and the measurement and computation of pay items.

Advertisements in the form of bulletins were issued for the Warrenville Road Project approximately five weeks prior to the April 18, 1986, letting date. The bulletin consisted of an identification of the project, a brief description of the project, and an identification of the project's major pay items. Dunteman requested the contract documents and obtained joint exhibits 1A, 1B and

1C approximately three weeks prior to the April 18, 1986, bid letting for the Warrenville Road Project.

The documents issued to Dunteman mandated the use of a proposal form for the submission of bids by interested contractors. Instructions to bidders were contained in the Standard Specifications for Road and Bridge Construction. Joint exhibit 1C, section 101.26 of the Standard Specifications prescribed the manner in which bidders were to submit their proposals as follows:

"Section 102.06 Preparation of the Proposal. The bidder shall submit his proposal on the form furnished by the Department. The proposal shall be executed properly, and bids shall be made for all items indicated in the proposal form, except that when alternate bids are asked, a bid on more than one alternate for each item is not required, unless otherwise provided. The bidder shall indicate, in figures, a unit price for each of the separate items called for in the proposal form; he shall show the products of the respective quantities and unit prices in the column provided for that purpose and the gross sum shown in the place indicated in the proposal form shall be the summation of said products."

Section 103.01 of the Standard Specifications provided:

"Section 103.01 Consideration of Proposals. After the proposals are opened and read, they will be compared on the basis of the summation of the products of the quantities shown in the bid schedule by the unit bid prices. In the event of a discrepancy between unit bid prices and extensions, the unit bid price shall govern."

Dunteman completed the prescribed proposal form and submitted an aggregate bid in the amount of $2,010,848.15. For topsoil, the Department's proposal form, contained in the Notice to Bidders, Specifications, Proposal, Contract and Contract Bond (hereinafter the "Notice"), identified the quantity needed for the Warrenville Road Project as 3,020 square yards. See joint exhibit 1B, page A0000123.

The documents contain a Summary of Quantities which quantify the scope of work to be performed under the contract. The Summary of Quantities, contained in the Plans for Proposed Local Agency Improvement Federal-Aid Project (hereinafter the "Plans"), specifies a

quantity number for each pay item of work and identifies the quantity of topsoil needed for the Warrenville Road Project as 3,020 square yards.

Artemio Viero Ramirez, an associate engineer at Barton-Aschman, testified that he did the geometric design of the project. He prepared the calculations for topsoil on a sheet of paper. Pages 2, 5 and 6 of Respondent's exhibit no. 1 are copies of his calculations for topsoil. He reviewed the cross-sections (apparently referring to joint exhibit 1A) prior to determining the calculations. Mr. Ramirez calculated the topsoil in cubic yards. It was standard practice for him to calculate topsoil needs in cubic yards. A review of sheet 3 (a typical cross-section) gives one enough information to roughly estimate the topsoil needs for the project. Mr. Ramirez's rough estimate based on the typical cross-section indicated a need for approximately 5,100 cubic yards or 45,900 square yards of topsoil. Mr. Ramirez believed one could calculate the rough estimate in two to three minutes and know immediately that the square yard specifications in other portions of the documents were not correct. The complete calculations using the cross-sections might take one day. The rough calculations are not contained in the plans and specifications.

The Department retained the right under the Contract to increase or decrease the quantity of existing pay items. The quantity of existing pay items could also increase or decrease due to conditions in the field. Pursuant to the Standard Specifications, final payment was to be based upon final quantities delivered to the site as measured in the field. Section 102.04 of the Standard Specifications states:

"Section 102.04 Interpretation of Quantities in the Bid Schedule. The quantities appearing in the bid schedule are approximate and are prepared for the

comparison of bids. Payment to the Contractor will be made only for the actual quantities of work performed and accepted or materials furnished in accordance with the contract. The scheduled quantities of work to be done and materials to be furnished may each be increased, decreased or omitted as hereinafter provided."

## Section 104.03 of the Standard Specifications states:

"Section 104.03 Alterations, Cancellations, Extensions and Deductions. The Department reserves the right to alter the plans, extend or shorten the improvement, add such work as may be necessary, and increase or decrease the quantities of work to be performed to accomplish such changes, including the deduction or cancellation of any one or more of the unit price items, or cancellation of the contract.

Should such changes in the plans result in an increase or decrease in the quantities of the work to be performed, the contractor shall accept payment as follows:

(a) All increases in such work of the type that appears in the contract as pay items accompanied by unit prices shall, except as provided under paragraph (c) herein, be paid for at the contract unit prices. Decreases in quantities included in the contract shall be deducted from the contract at the unit bid prices. No allowance will be made for delays or anticipated profits.

\* \* \*

All alterations, cancellations, extensions and deductions shall be authorized in writing by the Engineer before work is started. Such authorizations shall set up the items of work involved and the method of payment for each item.

Claims for extra work which have not been authorized in writing by the Engineer will be rejected."

During the course of construction, 121 of the original 174 pay items either increased or decreased in quantity. Fifteen new pay items were added and four pay items were deleted. Dunteman's initial contract value of $2,010,848.15 fluctuated through quantity increases or decreases and the deletion or addition of pay items in the amount of $504,913.45. Net additions to the initial contract value were $334,489.54 and net deductions to the initial contract value were $174,913.78. These additions and deductions do not include payments due for uncompensated topsoil.

The Contract Schedule of Prices and Summary of Quantities identify the quantity of topsoil needed for the Warrenville Road Project as 3,020 square yards. Dunteman submitted a unit price bid for topsoil of $23 per square yard. (See joint exhibit 1b, page A0000123.) The parties have stipulated that Dunteman delivered 24,286 square yards of topsoil and that Dunteman has been paid, to date, for 2,698.40 square yards of topsoil. Dunteman claims it has not been paid for 21,587.60 square yards of topsoil at $23 per square yard totaling $496,514.80.

Allan Dunteman, President and Chief Executive Officer of Claimant, testified that he considered the Warrenville Road Project to be a paving project and that paving quantities identified in the contract were "roughly checked to find out if the work was related to more difficult work or less difficult work." He testified that topsoil quantities were not checked. He further testified that it would have taken a good engineer a couple of weeks to verify all of the quantities identified in the contract's 174 pay items. Mr. Dunteman also testified that his bid on the Warrenville Road Project was unbalanced because of the contract's incidental costs, overhead and profit for which there were no pay items. Incidental costs, overhead and profit had to be added by Dunteman to some of the existing 174 pay items.

The parties stipulated that Jay Pienkos, Dunteman's estimator for the Warrenville Road Project, would testify that he did not verify the amount of topsoil identified in the contract documents.

Relevant provisions of the standard specifications regarding the topsoil payment and measurement are, in part, as follows:

"Section 109.01 Measurement of Quantities. All work completed under the contract will be measured by the Engineer according to the United States standard measures.

.

* * *

Section 216.07 Method of Measurement.

(a) Contract Quantities. When the project is constructed essentially to the lines, grades and dimensions shown on the plans, and the Contractor and the Engineer have agreed in writing that the plan quantities are accurate, no further measurement will be required and payment will be made for the quantities shown in the contract for the various items involved, except that if errors are discovered after work has been started, appropriate adjustments will be made. When the plans have been altered or when disagreement exists between the Contractor and the Engineer as to the accuracy of the plan quantities, either party shall, before any work is started which would affect the measurement, have the right to request in writing and thereby cause the quantities involved to be measured as hereinafter specified.

* * *

(b) Measured Quantities. Topsoil will be measured in cubic yards for Topsoil Excavation and in square yards for Topsoil Placement.

* * *

2. Topsoil Placement will be measured in square yards of the thickness specified at the locations shown on the plans just prior to the seeding operation. This item shall include the placing of the stockpiled topsoil or obtaining and placing acceptable topsoil from outside the right of way.

* * *

216.08 Basis of Payment. This work will be paid for at the contract unit price per cubic yard for Topsoil Excavation and at the contract unit price per square yard for Topsoil Placement to the lines, grades and depths shown on the plans.

* * *

Topsoil Placement shall include the excavation, hauling and placing the stockpiled topsoil, or furnishing, hauling and placing topsoil from outside the limits of the right of way. No additional compensation will be allowed for the topsoil furnished by the Contractor from areas outside the limits of the right of way."

In addition, the Special Provisions, which supplement the Standard Specifications (page A0000026 of joint exhibit 1B) provide as follows:

"Topsoil Placement: This item shall be constructed in conformance with Section 216 of the Standard Specifications. Topsoil has been provided for all areas to be seeded or sodded. The topsoil shall be obtained from areas outside the right-of-way and be placed in a 4" thickness. The removal of existing vegetation for placing topsoil should be considered incidental to Topsoil Placement 4".

The topsoil placement will be measured in square yards and will be paid for at the contract unit price per square yard for Topsoil Placement 4"—which price shall include the furnishing and placing of topsoil."

Mr. George P. Karlis, the field inspector and resident engineer employed by Barton-Aschman, was directly responsible for keeping daily quantity and diary records. He did not keep track of the topsoil in a fashion that would allow him to know on a daily basis what the actual quantity of topsoil which was put in place. See joint exhibit 1F, page A00000157, par. 1.2.1g & h.

Arthur H. Daumke testified that he was Dunteman's job superintendent, and turned in daily project reports. He did not ask for permission when more than 3,020 square yards of topsoil were placed. According to joint exhibit no. 2, the final net quantity for 4" topsoil spread by Claimant is 24,286 square yards or 2,698.4 cubic yards.

On October 21, 1986, resident engineer George Karlis issued a stop work order to Dunteman for topsoil placement. He concluded that the amount of topsoil requested by the Contract Schedule of Prices was insufficient compared to the plans stated in the actual field requirements.

On November 10, 1986, at a meeting held between representatives of IDOT, Barton-Aschman, Lisle, and the DuPage County Division of Transportation, MaryLou Kalsted, the resident engineer (from Lisle), recorded the following statement from Alex Jordan, IDOT's construction engineer for the Warrenville Road Project:

"Alex Jordan stated that this contract had a 'big problem.' The problem is that for five items—topsoil, sod, phosphorus, nitrogen and potassium—the actual quantities needed to complete the job are nine to ten times higher than the 'plan quantity' that is shown on the bid tabulation. Jordan states that Barton-Aschman blew it twice—once on the plans and once by letting the contractor put down quantities of materials that were greatly in excess of the plan quantities without prior authorization.

\* \* \*

Jordan stated that IDOT does allow 'unbalanced bids.' There is no prohibition against this practice. The bid for the topsoil of $23 per square yard is considered an 'unbalanced bid' in that it is approximately nine times higher than a reasonable bid for this unit."

At a meeting on February 4, 1987, between representatives of IDOT, Barton-Aschman and Lisle, notes by MaryLou Kalsted indicate that Ralph Wehner, the acting District Engineer for District 1, states that there was "No error. No contractor [is] obligated to check plans for math errors. Why didn't Springfield catch it while checking bids (unbalanced bid)." It was stipulated by the parties that Ralph Wehner would testify that he did not make those statements.

Claimant's exhibit nos. 4, 5 and 6 show that prior to the April 18, 1986, bid letting, IDOT prepared three independent estimates of the cost to construct the Warrenville Road Project. The District 1 office prepared an estimate for this project in the amount of $2,684,422. Barton-Aschman prepared an estimate in the amount of $3,045,680 to construct the Warrenville Road Project, and IDOT's Engineer of Estimates in the central office prepared an estimate in the amount of $2,638,248.82. Dunteman seeks the sum of $2,666,938.71 for the construction of the Warrenville Road Project. This sum consists of Dunteman's total adjusted contract value of $2,170,423.91 plus the sum of $496,514.80 for uncompensated topsoil placed at the Warrenville Road Project.

## Claimant's Arguments

Claimant argues that the issue before the Court is whether the contract is enforceable against the Department as written.

The undisputed facts are that Dunteman placed 24,285.6 square yards of topsoil at the Warrenville Road Project at the Department's discretion and with its approval. The contract obliges the Department to remit

payment to Dunteman for that quantity of topsoil at the rate indicated in the Contract Schedule of Prices.

Contract obligations derive from the plain words of the contract itself. In *Lenzi v. Morkin* (1984), 103 Ill. 2d 290, 293, the Supreme Court stated, "In the absence of an ambiguity, the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself, not by the construction placed upon it by the parties." (*Accord, Wysocki v. The Upjohn Co.* (1987), 157 Ill. App. 3d 868, 872; *Touhy v. Twentieth Century-Fox Film* (1979), 69 Ill. App. 3d 508, 512-13.) In *Hoel-Steffen Construction Co. v. State* (1982), 35 Ill. Ct. Cl. 108, 110-11, this Court stated (citing *Touhy, supra*): "It is the generally accepted rule of law that the rights and obligations of the party to a contract are determined from the plain, unambiguous wording of the contract."

In the present case, the unambiguous terms of the contract leave no room to second guess the Respondent's obligations. The Department specifically reserved the right to increase the quantities of work indicated in any of the unit price items, and it agreed to pay Dunteman for the increase at the contract unit price. See joint exhibit 1C, article 104.03.

In *Krueger Construction Co. v. State* (1972), 28 Ill. Ct. Cl. 82, the claimant sought full compensation for quantities of dirt furnished under a unit price contract. In *Krueger, supra*, this Court stated (28 Ill. Ct. Cl. at 86):

"The written agreement between the parties was not a lump sum contract. It was a unit price contract calling for payment at the unit price for the quantities of materials actually used. At the agreed price of $2.20 per cubic yard, we find that the claimant should have been paid an additional sum of $3,863.20 for the additional 1,756 cubic yards of dirt actually used in the project."

No error or omission appears on the face of the contract. Section 216.07(b) of the Standard Specifications states that topsoil will be measured in square yards for topsoil placement. The Notice to Bidders provides:

"The topsoil placement will be measured in square yards and will be paid for at the contract unit price per square yard for Topsoil Placement 4"—which price shall include the furnishing and placement of topsoil."

The Contract Schedule of Prices shows a "square yard" unit of measure supplied by the Department for topsoil placement, and the quantity is an estimated 3,020 yards, which is roughly equivalent to the 3,055 square yards estimated for the sodding pay item, as one would expect. (See joint exhibit 1B, page A0000119-127.) The contract's Summary of Quantities again shows 3,020 square yards of topsoil. (See joint exhibit 1A, sheet 8.) The requirement of 3,020 square yards of topsoil does not present an apparent error or omission.

There is not an ambiguity in the contract because of reference to the cross-section plans as maintained by Respondent. The cross-sections do not show the amount of topsoil required or the unit of measure, and they do not contradict any of the other contract documents. Although a contract must be construed as a whole, an unequivocal statement which is not contradicted by any other provision in the contract cannot be deemed ambiguous. *Lyons Sav. and Loan Ass'n. v. Geode Co.* (1986), 641 F. Supp. 1313, 1322 (N.D.Ill.).

The cross-section plans are drawings which depict the location and dimensions of work to be performed. The cross-section plans further present a scaled representation of the roadway at various stations. From the cross-section plans, Respondent argues that Dunteman should have completed additional arithmetic equations and scaled the drawings to determine a different topsoil quantity. Under Respondent's apparent error theory, Dunteman had the

duty to either rely upon the scaled cubic yard quantity measurements contained in the cross-section plans and extend those from station to station and then convert them to square yards or Dunteman was to ignore these quantities and conduct independent measurements with the use of a planimeter to calculate square yard quantities. Section 105.05 of the Standard Specifications clearly provides that, "in case of discrepancy, calculated dimensions will govern over scaled dimensions." The Contract's calculated dimensions (3,020 square yards at 4" depth) are contained in the Summary of Quantities and the contractor's proposal form (the Contract Schedule of Prices). Scaled dimensions are represented by the cross-sections. Consequently, a bidder has no affirmative duty to verify the Department's calculated quantities and, where a discrepancy exists, the contract documents provide that calculated dimensions (3,020 square yards) shall control. Furthermore, the "discrepancy" is clearly not apparent when the bidder would have to calculate multiple arithmetic equations for each of the hundreds of stations depicted in the cross-section plans.

Bidders do not always have time to make their own calculations or verify the accuracy of quantities estimated by the owner. Contractors are businessmen, and in the business of bidding on governmental contracts, they are usually pressed for time and are consciously seeking to underbid a number of competitors. (*Blount Bros. Construction Co. v. United States* (1965), 346 F. 2d 962, 971.) Allan Dunteman testified that his company annually considered approximately 600 construction contracts and bid approximately 300 of the contracts considered. Allan Dunteman further testified that approximately 200 of the 300 contracts bid each year are bid during the spring when owners are looking to begin construction.

In this case, Respondent asks this Court to ignore an agreed upon unit price for topsoil in the contract. The Department argues that it should be allowed to retain the benefit it received under the contract because $23 per square yard of topsoil is an unbalanced unit price. Respondent has received a project fully completed by Dunteman for $2,170,423.91, after it independently estimated the total cost to construct to be either $2,684,422; $3,045,680; or $2,638,248.82.

Unbalanced unit prices are permitted. In *Frank Stamato & Co. v. City of New Brunswick* (1952), 90 A.2d 34, 36 (N.J. Superior), the Court held:

"An unbalanced bid comprehends a bid based on nominal prices for some work and enhanced prices for other work. The mere fact that a bidder has submitted an unbalanced bid, does not automatically operate to invalidate an award of the Contract to such bidder. There must be proof of collusion or of fraudulent conduct on the part of such bidder and the city or its engineer or other agent, or proof of other irregularity of such substantial nature as will operate to affect fair and competition bidding."

Every contractor may apply his own business judgment in the preparation of a public bid, and unbalancing is perfectly proper absent fraud or collusion. See, e.g., *Riverland Construction Co. v. Lambardo Contracting Co.* (1977), 380 A.2d 1161, 1163-65 (N.J. Superior); *Armaniaco v. Borough of Cresskill* (1960), 163 A.2d 379, 384 (N.J. Superior).

Section 102.08 of the Standard Specifications contains the only reference to unbalanced bidding in the contract. That section states that the "Department reserves the right to reject unbalanced proposals * * * in which the bid prices for some items are obviously out of proportion to the bid prices for other items." It has been held that a reservation of the right to reject unbalanced bids is not an absolute prohibition against unbalancing. *Manhattan Security Corp. v. Delaney* (1929), 233 N.Y.S. 241.

The Department had 33 days, ample time, to reject Dunteman's bid after the bids were opened and prior to execution of the contract on May 21, 1986. The Department also had ample time during the next 152-day period to cancel the topsoil pay item under article 104.03 of the Standard Specifications. The quantity issue was not raised by the Department until October 20, 1986, but by then the contract work was nearly finished. Dunteman had already placed more than 24,000 square yards of topsoil.

In fairness, the parties must stand on level ground when it comes to enforcing the mutual obligations under a unit price contract. This is not the case of a contractor seeking windfall profits. If the sum of $496,514.80 is awarded, Dunteman will still have completed the Warrenville Road Project below two and near one of the Department's three independent estimates.

### Claimant's Argument After Second Hearing

During the second hearing, Allan Dunteman, president of Claimant, and William Minnick, Jr., controller of Claimant, both testified that Claimant sustained a loss in excess of $420,000 on the project.

Respondent failed to introduce any evidence to rebut Claimant's claimed losses, or to challenge Claimant's method for determining the loss it suffered. Respondent offered no evidence to disprove any of the Claimant's calculations or its analysis of such loss.

Respondent's pleadings arguably state three affirmative defenses, namely claim of estoppel; a claim of unjust enrichment; and a claim of mutual mistake.

While Respondent sought the second hearing so that it could introduce evidence to support all of its equitable defenses, it elected to introduce evidence to support only mutual mistake.

The requisite elements of a defense to rescind a contract based upon mutual mistake are contained in the case of *Keller v. State Farm Insurance Co.* (1989), 180 Ill. App. 539. In *Keller, supra*, the Court held that in order to rescind a contract on the basis of mutual mistake of fact:

"* * * the party seeking rescission must show by clear and positive evidence that a mistake has been made in a material feature of the contract, that the mistake is of such grave consequence that to enforce the contract would be unconscionable, that the mistake occurred notwithstanding the exercise of due care on the party seeking rescission, and that the other party may be placed in the *status quo*." 180 Ill. App. 3d at 548. Accord, *Casanas v. Nelson* (1986), 140 Ill. App. 3d 341.

Respondent must prove, by clear and convincing evidence, that a mistake was made; that the mistake relates to a material feature of the contract; that the mistake occurred despite due care on the party seeking the relief; that the other party (in this case, Claimant) can be placed in the *status quo* position; and that to ignore the mistake and enforce the contract would be unconscionable. The State has failed to prove each and every required element.

Respondent claims that the contract contains a mistake, which the State identifies as "a scrivener's error" in the estimate of quantities. The State's assertion is not supported by the evidence. Glenn Shirmer, Vice President of Barton-Aschman, stated,

"There was a scribner's [sic] error in that a quantity of topsoil that was properly computed by [a Barton-Aschman employee] in cubic yards, when it was placed on the Summary of Quantities sheet, the number which had been computed in cubic yards was transposed directly alongside of a square yard unit of measure."

If Respondent's "scrivener's error" is that the unit item was stated as "sq. yds." as opposed to "cu. yds.," then Respondent's contention is contrary to the Standard Specifications which comprise part of the contract documents. The Standard Specifications provide, "The work will be paid for * * * at the contract unit price *per square*

*yard* for TOPSOIL PLACEMENT * * *." See joint exhibit 1C, Sec. 216.08.

If Respondent's claim is that the "scrivener's error" was the wrong number being inserted in the documents (3020 rather than 27,180), then a mistake did indeed occur. Such mistake, however, is irrelevant to this cause since it is not in the contract.

There are three documents relevant to this analysis. They are the Contract Schedule of Prices contained in the bid documents; the Unit Price Schedule in the contract; and the Summary of Quantities of joint exhibit 1A, sheet 8.

The first document, the Contract Schedule of Prices, sets forth the applicable pay items, their method of measurement, and their pay rate. The applicable portion is as follows:

| Item # | Pay Item Description | Quantity | Unit of Measure |
|---|---|---|---|
| 21603 | Topsoil Place 4 | 3020 | sq. yd. |

The second document, the Unit Price Schedule, is identical to the Contract Schedule of Prices, except that it also contains the Claimant's accepted bid price of $23 and an extension of the unit price times the estimated quantity.

The final document is the Summary of Quantities page of the plans (joint exhibit 1A, sheet 8). The relevant portion is as follows:

| Code # | Description | Unit of Measure | Participating | Non-Participating | Total |
|---|---|---|---|---|---|
| 21603 | Topsoil | sq. yd. | 2946 | 74 | 3020 |

If the parties reach an agreement, the Contract Schedule of Prices is supplanted by the Unit Price Schedule,

which contains identical information and such critical additional information as the price agreed for each unit item.

There are only two criteria for determining the amount to be paid the Claimant for the work performed: (1) the actual quantities, and (2) the applicable pay rate, as set forth in the Unit Price Schedule. Therefore, once the contractor's bid is accepted, the quantity estimate in the Unit Price Schedule is a nullity. Section 102.04 of the Standard Specifications states that it is merely an estimate. It has no bearing on the work to be performed or the monies to be paid the contractor. As such, it cannot be deemed part of the contract.

The final place where the "mistake" appears is in the Summary of Quantities. As with the Unit Price Schedule, the Summary of Quantities comprises estimates only, and has no bearing on the work to be performed or the amount that the contractor will be paid.

It is undisputed that the Summary of Quantities contains estimates only. It is also undisputed that the Summary of Quantities is not used in the construction of the job, and has no bearing on payment.

Since the Summary of Quantities contained in the plans comprise estimates only, it is created and used solely to compare bids.

In addition to requiring that a mistake exists, the law requires that the claimed mistake "relate to a material feature of the contract." (*Keller, supra*, at 548.) Claimant submits that a mistake in the Unit Price Schedule and the Summary of Quantities cannot, as a matter of law, be a material feature of the contract.

Since the Unit Price Schedule and Summary of Quantities have no bearing on either the monies to be

paid to the contractor or the actual work to be performed by the contractor, they cannot be a material feature of the contract.

The third requirement of a claim of mutual mistake is that the mistake occurred despite the use of due care by the person claiming the mistake. (*Keller, supra,* at 548.) Respondent failed to prove the necessary due care.

It is undisputed that Respondent had the right to reject Claimant's bid solely because it was unbalanced. Section 102.08 of the Standard Specifications provides, "The Department reserves the right to reject * * * Unbalanced proposals in which the bid prices for some items are obviously out of proportion to the bid prices for other items."

Respondent has argued that Claimant's bid was unseemly because it priced the topsoil placement items at $23/sq. yd.

Not only is such an argument improper because it is unsupported by any evidence, but it also ignores the fact that the State knew before it accepted Claimant's bid that the bid was unbalanced and that Claimant's topsoil placement bid was high. This fact is proven beyond dispute by both the testimony of Virgil Moreno, Engineer of the Estimates Department of the Illinois Department of Transportation, and Claimant's exhibit no. 10. Claimant's exhibit no. 10 is a page taken from the State's Tabulation of Bids, a document prepared by the Estimating Department which comprehensively compares all of the bids by both total price and unit price. Mr. Moreno testified that Claimant's exhibit no. 10 shows that someone in his office made the red marks next to the item showing R. W. Dunteman Company and then showing a unit price of $23.

The State knew before it accepted Claimant's bid that Claimant's bid was unbalanced and the topsoil placement was high. The topsoil placement unit item ranged

between $4.50/sq. yd. and $5/sq. yd. in the Department's independent estimators' estimates. The topsoil placement item for the four bidders ranged between $1.05 and $4.50 per square yard.

The due care requirement imposes on the State a duty to make reasonable inquiry to determine the reason for the divergence.

The fourth element of a mutual mistake claim is that the claimant be returned to its original position before the equitable relief may be granted. (*Keller, supra*, at 548.) This is also expressed in the case, *Community Bank of Utica v. Calkins* (1977), 52 Ill. App. 3d 759. In *Community Bank, supra*, the defendant sought to avoid enforcement of a guaranty claiming mutual mistake. The Appellate Court determined that the relief claimed could not be awarded.

"Once one party has fully performed, unless the other party tenders return of the consideration, the non-performing party is not entitled to rescind a contract on the grounds of mistake. [citation omitted] In light of the defendant's inability to return the consideration given by the bank, he cannot avoid the contract in its entirety."

In the case at bar, Claimant has fully performed. The State would have to undo the work and return it to Claimant as a prerequisite to relief for mutual mistake.

Respondent presents the novel argument that Claimant will be paid too much money. This argument assumes that Respondent has the unilateral right to determine what is a reasonable price regardless of the contract.

Claimant argues that even though prejudgment interest and attorney's fees are not customarily awarded, the manner in which the State has defended this case mandates an exception to the rule. Respondent has filed no less than 11 motions to extend time and routinely filed briefs and other pleadings late. Additionally, it took the State four years to file an answer and the State was still filing "affirmative defenses" as late as November 1993.

Claimant has incurred substantial and unnecessary attorney's fees as a result of the Respondent's actions.

## Respondent's Argument

Claimant had knowledge of the error contained in the contract documents at the time it submitted its bid and took advantage of the obvious error by unbalancing the bid price for topsoil by requesting $23 a square yard. Section 105.05 of the Standard Specifications states in part:

"* * * The contractor shall take no advantage of any apparent error or omission in the plans or Specifications, and the Engineer shall be permitted to make such corrections and interpretations as may be deemed necessary for the fulfillment of the intent of the plans and Specifications."

Respondent argues that the issue in this case involves a discrepancy between the quantity of topsoil shown in the cross-section plans furnished to the Claimant and the contract schedule of prices.

Under section 105.05, if a contractor expects to resolve an issue in its favor, it is incumbent upon the contractor, prior to submitting its bid, to advise the Department of the discrepancy that exists in the contract. (*Space Corp. v. United States* (1972), 470 F.2d 536, 200 Ct. Cl. 1.) *Space Corp., supra,* and its progeny hold that when a patent ambiguity exists at the time of contracting, it is incumbent upon the contractor to bring it to the attention of the government. The purpose is to deter a

"* * * bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid * * * with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials disagree with the contractor's interpretations." *Maintenance Engineers, Inc. v. U.S.* (1990), 21 Ct. Cl. 553 at 560.

To determine whether Claimant took advantage of the error, the issue becomes whether the disputed provisions were patently ambiguous at the time of contracting so that a reasonable and prudent contractor knew or

should have known of the discrepancy. The Respondent argues Claimant had knowledge or should have had knowledge of the error because of Claimant's admission that he unbalanced his bid for the topsoil, by presumption in that Claimant failed to produce the documents indicating how he arrived at the $23 per square yard price (compared to the national average of $1.76 per square yard), and by inference from Allan Dunteman's refusal to testify.

The Department was permitted under section 105.05 of the Standard Specifications to make any corrections needed to fulfill the intent of the plans and specifications.

Claimant's bid practice clearly indicates it had knowledge of the error regarding the quantity of topsoil and it intentionally and purposely unbalanced its bid to make a financial windfall profit on the topsoil item. This Court should not permit Claimant to take advantage of the error contained in the schedule of prices because it would encourage contractors such as Claimant to unjustifiably unbalance their bids to get the contract and make a wrongful profit. Claimant contends that *Krueger Construction Co., Inc. v. State* (1972), 28 Ct. Cl. 82 is applicable to the facts of this case. *Krueger* is inapplicable because it does not involve section 105.05 of the Standard Specifications and did not have a discrepancy regarding the amount of topsoil needed to place on that job. It should be noted that in the *Krueger* case, the claimant charged $2.20 for topsoil and sought only $3,863.20 for the additional topsoil that was placed, not $500,000 for nine times more topsoil.

A similar situation arose in *Commonwealth of Pennsylvania, Department of Transportation v. Anjo Construction Co., Inc.* (1985), 487 A.2d 455 (hereinafter referred to as the *"Anjo"* case). In *Anjo*, the contractor agreed to

perform slabjacking and concrete patching for a project in Pennsylvania. Like Respondent in the instant action, PennDot agreed to pay the unit prices set forth in the schedule of prices. The schedule of prices, however, contained an error based on a mistaken assumption in the quantity of the pay item, admixture. PennDot later realized that 34,324.8 ounces of admixture were necessary to complete the project and not 195 ounces at $10 per ounce as originally estimated. After plaintiff had furnished 2,553.6 ounces of admixture, PennDot ceased operations on the slabjacking portion of the work because plaintiff and PennDot could not agree on a reduced unit price. Plaintiff admitted that at the time he submitted his bid, he knew there was an error in the quantity schedule of prices.

In the *Anjo* case, the plaintiff contended that section 102.04 of Form 408 Specifications controlled this issue. Section 102.04 provided that quantities of materials specified in the contract are merely estimates or approximations. PennDot based its defense on a provision in the contract that is similar to the provision relied on by Respondent in the instant claim. In *Anjo*, the contract incorporated the following provision:

"Section 105.04. COORDINATION OF DRAWINGS AND SPECIFICATIONS. The Contractor shall perform the work in accordance with the intent of the specifications, and shall not take advantage of any error or omission in the drawings and specifications. In the event the contractor discovers an error or omission, he shall immediately notify the engineer."

The Appellate Court ruled that section 102.04 did not "excuse Anjo from notifying DOT of a known discrepancy between the 195 ounces of admixture called for by contract and the 35,324.8 ounces required." (*Id.* at 459.) The *Anjo* Court further held that "where a contractor discovers an obvious error or discrepancy in a contract, he is obliged to bring the situation to the Commonwealth's attention if

he intends to subsequently resolve the issue in his own favor." *Id.* at 459.

Like the defendant in *Anjo*, the Department's contract with Claimant contained an error in the schedule of prices. After the work began, it was discovered that the contract schedule of prices for topsoil, as written, indicated only 1/9th of the amount required to meet the plan quantity as necessitated by the cross-sections. Claimant's admission that it manipulated the price for topsoil, considered with other factors regarding Claimant's behavior, leads one to the only conclusion possible, that Claimant had knowledge of the error at the time it submitted its bid and failed to bring it to the attention of the Department.

Mr. Dunteman testified that he had reviewed the plans prior to the time he submitted his bid, but he did not detect the error in the plans. Also, no one from Claimant's company went to the job site to verify the amount of topsoil that was to be placed.

Claimant's bid was $23 per square yard for 3,020 square yards of topsoil. Based on Claimant's bid, the Department expected to pay Claimant $69,460. This amount does not call attention to itself.

Claimant has cited cases that state that unbalancing bids is normal practice. Claimant neglects to state that unbalancing a bid is inappropriate when there is indication of fraud on the part of the bidder or when there is proof of other irregularity of such substantial nature as will operate to affect fair and competitive bidding. (*Stamato & Co. v. City of New Brunswick* (1952), 20 N.J. Superior 340, 90 A.2d 34.) In the instant matter, there is enough evidence that Claimant knew about the error and deliberately failed to disclose the error in order to reap an unwarranted windfall of almost $500,000.

Additionally, Claimant failed to produce documents evidencing how it arrived at the $23 per square yard for the topsoil. Failure to produce these documents creates the presumption that if these records were produced, they would show Claimant had knowledge of the error contained in the contract documents. In this case, Claimant has the burden of proving the reasonableness of his claim of $23 per square yard for topsoil which is the basis of his contention that he is owed almost $500,000.

The discrepancy between the quantity of topsoil in the schedule of quantities and the cross-sections should have been obvious to an experienced contractor such as Claimant. Allan Dunteman testified he is very experienced in bidding on Department contracts. In fact, in April of 1986, the same letting period for the instant contract, Claimant bid on six contracts.

Richard L. Conklin, Respondent's expert, testified that an experienced estimator/contractor would have knowledge that the 3,020 square yards in the Schedule of Quantities was in error at the time he was preparing his bid. Mr. Conklin testified that any experienced contractor or estimator in the excavation and topsoil area would quite readily see a discrepancy as to what was on the plans and what was listed on the Contract Schedule of Quantities.

Jay Pienkos, the chief estimator and the individual who put the bid estimate together, should have detected the error. It should have been patently obvious to Mr. Pienkos that the Contract Schedule of Quantities for the topsoil was deficient by a factor of nine as compared with what was contained in the typical cross-sections. He stated that one could verify the amount of topsoil needed in less than a minute from page 3 of the plans.

Antemio Ramirez also testified that one could get a rough estimate of the amount of topsoil needed in two or three minutes. Even Allen Dunteman testified that one could get a rough estimate of the total amount of topsoil needed for this project from the typical sections.

Richard Conklin opined that $23 per square yard for topsoil was exceptionally high in his experience working as an estimator bidding on projects that had utilized topsoil. He also looked at a nationally-recognized estimating manual which indicated the typical price for topsoil was $1.76 per square yard. Alexander Jordan, Chief of the Bureau of Construction at the time of the occurrence, testified that the normal price for topsoil is $1.50, $2 and $2.50 per square yard. Mr. Conklin testified that he had never seen topsoil bid at $23 a square yard.

Mr. Conklin further testified that an experienced superintendent would have come to the conclusion that the amount of topsoil that was being laid at the site was inconsistent with the planned quantities. The superintendent will have to physically obtain the topsoil, line up the equipment, such as trucks, front-end loaders, laborers and equipment operators to complete the placement of the topsoil. The superintendent would specifically want to know how much topsoil he was going to place, how many trucks it would take to do the job, and how long the trucks would be utilized for this job. It took 10 days to place the topsoil for this project. After one day's work, the superintendent should have recognized the fact that his crew was only 1/9th of the way done with this work.

Arthur Daumke, Claimant's superintendent on the job, was responsible for placing the topsoil. He kept track of the work that was being done at the job site in the daily reports. Topsoil is reflected by item no. 220. Mr. Daumke testified that it took him 11 days to place the topsoil.

None of Claimant's employees advised the Department of the shortage of topsoil, nor did any of these people request permission to place the additional 21,266 square yards of topsoil.

Claimant erroneously cites the case, *Constanza Construction Corp. v. City of Rochester* (App. Div. N.Y. 1989), 537 N.Y.S.2d 394. The *Constanza* case is inapplicable to this case because the sewer contractor underestimated the amount of excavation that was needed to complete the project. In the case at bar, the contractor did not underestimate the amount of topsoil necessary for this job, but did, in fact, bring the right amount of topsoil per the cross-sections and ignored the amount of topsoil that was listed in the Contract Schedule of Prices.

In *Maintenance Engineers, supra,* there was a discrepancy between the square area contained on the legend regarding a weed and grass area and the actual area. The legend stated that the square feet area was 167,000 square feet while the area actually contained 1,886,000 square feet. The contractor sought reimbursement for the increased expenses due to the unexpected 11-fold increase in square footage as opposed to what was contained in the legend. The Court denied plaintiff's claim. The Court first determined that an ambiguity existed in the contract. The Court in *Maintenance Engineers, supra,* stated that a patent ambiguity is defined inexplicably as an ambiguity that is "so glaring as to raise a duty to inquire." A contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry. *Carothers Constr. Co., Inc. v. United States* (1990), 20 Ct. Cl. 556, 560 (citing *J. A. Jones Constr. Co. v. United States* (1968), 184 Ct. Cl. 1, 395 F.2d 783).

In accordance with *Maintenance Engineers, Inc., supra,* a reasonable and prudent contractor, such as

Claimant, should have recognized the discrepancy between the quantity of topsoil listed in contract schedule of prices versus the quantity of topsoil contained in the cross-sections and typical sections.

Section 104.01 of the Standard Specifications requires that the contractor will perform all work in accordance with the Plans and Specifications. Section 104.01 states:

"Intent of the Plans and Specifications. The intent of the Plans and the Specifications is to prescribe a complete outline of work which the Contractor undertakes to do in full compliance with the contract. The Contractor shall perform all earthwork, construct all base and surface courses, structures, and such additional, extra and incidental construction as may be necessary to complete the work to the finished lines, grades and cross sections in a substantial and acceptable manner. He shall furnish all required materials, equipment, tools, labor, and incidentals, unless otherwise provided in the contract, and shall include the cost of these items in the unit prices bid for the several units of work."

Section 105.04 provides that the contractor shall perform work in conformity with the Plans and Specifications. This section provides:

"All work performed and all materials furnished shall be in reasonably close conformity with the * * * cross sections * * * shown on the plans or indicated in the Specifications."

Section 102.05 of the Standard Specifications requires the contractor to examine carefully the work site, the plans, the proposal forms, and to inspect and be familiar with the local conditions affecting the work site. Section 102.05 states:

"Examination of Plans, Specifications, Special Provisions and Site of Work. The prospective bidder shall, before submitting his bid, carefully examine the proposal form, plans, specifications, Special Provisions and form of contract and bond. He shall inspect in detail the site of the proposed work and familiarize himself with all the local conditions affecting the contract and the detailed requirements of construction. If his bid is accepted, he will be responsible for all errors in his proposal resulting from his failure or neglect to comply with these instructions. The Department will, in no case, be responsible for any change in anticipated profits resulting from such failure or neglect."

Additionally, the requirements of section 102.05 were reiterated on the Bid Form BD 353 (8-79), item 4, which states:

"The undersigned further declares that he has carefully examined the proposal, plans, specifications, form of contract, and contract, and contract bond, and special provisions (if any), and that he has inspected in detail the site of the proposed work, and that he has familiarized himself with all of the local conditions affecting the contract and the detailed requirements of construction, and understands that in making this proposal he waives all right to plead any misunderstanding regarding the same."

Section 102.04, Interpretations of Quantities in the Bid Schedule, states in part:

"* * * that the quantities in the bid schedule are only approximate and are prepared for the comparisons of the bids * * * The scheduled quantities of work to be done and materials to be furnished may each be increased, decreased or omitted as hereinafter provided."

Contrary to Claimant's contention, Claimant cannot now expect to recover based on its failure to perform its obligations or to properly examine the work site and the plans.

The site investigation clause and the bid form warned that Claimant would be responsible for checking the local site conditions and for examining the plans and specifications. These contract provisions, along with the Claimant's general knowledge in performing many contracts and doing earthwork, demonstrate that Claimant's reliance on the error contained in the contract was unjustified. If Claimant had reviewed the cross-sections and had gone to the job site to review the area to determine the amount of topsoil necessary, it would not be in the predicament it finds itself in.

Respondent's Affirmative Defenses Argument

Respondent has pled three affirmative defenses, namely, estoppel, unjust enrichment, and mutual mistake of fact.

In the initial hearing, the Department was not permitted to put into evidence testimony regarding its contract

defense, mutual mistake of fact. A mistake may be pleaded as a defense to a contract action. (17 C.J.S. Sec. 146.) Mutual mistake is a contract defense based in law but it utilizes the equitable principle, rescission in executing it as a defense. In order to show that there was a mutual mistake, the party pleading it must prove that the mistake relates to a material feature of the contract, that it is of such grave consequence that enforcement of the contract would be unconscionable, that it occurred notwithstanding the exercise of reasonable care, and that the other party can be placed in *status quo*. *Santucci Construction Co. v. County of Cook* (1974), 21 Ill. App. 3d 527.

This Court has applied the contract defense of mutual mistake in other Court of Claims cases. (See *Rossi Contractors v. State* (1975), 31 Ill. Ct. Cl. 133; *Duffy v. State* (1978), 32 Ill. Ct. Cl. 633; and *Crawford, Murphy & Tillis, Inc. v. State* (1977), 32 Ill. Ct. Cl. 71.) Thus, this Court has jurisdiction to hear the affirmative defense of mutual mistake by virtue of the fact that it is a defense based in law and not in equity as to the contract action.

The Department's affirmative defenses of estoppel and unjust enrichment are equitable in nature. The Court of Claims has jurisdiction to hear defenses to a contract action that arise out of equitable principles due to the fact that it has jurisdiction to hear contract actions.

This Court in *Wilder Mobile Homes v. State* (1980), 33 Ill. Ct. Cl. 227, acknowledged estoppel as a valid defense to the contract. In *Wilder, supra,* claimant leased mobile homes to respondent for the time period of July 1, 1977, to June 30, 1978. Subsequent to the signing of the lease, it was learned that the leases were not awarded pursuant to competitive bidding procedures required under the State Purchasing Act. On January 19, 1978, the State vacated the mobile homes. The State employee who entered into the contract did not have legal authority to do

so since there was no compliance with the State Purchasing Act. The Court stated, "[t]he State is not estopped from denying the legality of a contract even though it has accepted the benefits." Additionally, in *Maintenance Engineers, supra*, the United States Government was allowed to plead its affirmative defense of estoppel. Similarly, Respondent should be able to raise its equitable defense of estoppel or any other equitable defenses it may have to the contract.

Contract actions have defenses that are equitable and legal. By only allowing the State to raise legal defenses that do not utilize equitable principles would severely limit the defenses the State would be able to plead in defending contract actions.

Respondent argues in its brief that it was precluded from setting forth its mutual mistake defense by Claimant's counsel's refusal to allow Allan Dunteman to answer the question posed to him as to whether he actually knew that 27,180 square yards of topsoil and not 3,020 square yards of topsoil were needed to complete the Warrenville Road Project. Respondent maintains that the failure to answer the question gives rise to the inference that Claimant had actual knowledge of the error in the quantity of topsoil listed in the bid documents. Therefore, Claimant knew that 27,180 square yards (not 3,020 square yards) of topsoil were necessary and bid $23 per square yard to intentionally take advantage of the error. Respondent cites I.P.I. 5.01, Failure to Produce Evidence or Witness.

Respondent asserts that the claim should be denied because Claimant attempted to perpetuate a fraud on the State. (See section 14 of Court of Claims Act, 70 ILCS 505/14.) Claimant knew of the error in the stated amount of topsoil and failed to advise Respondent.

Respondent argues that Claimant is in breach of the implied obligation of good faith and fair dealing. The term "good faith" means, "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting." *Capitol Options Investments, Inc. v. Goldberg Bros. Commodities* (1992), 958 F.2d 186; *Thiems Construction Co. v. State* (1993), 45 Ill. Ct. Cl. 267.

Estoppel, an equitable doctrine, prevents Claimant from taking advantage of his own wrongdoing. In *M. J. Oldenstedt Plumbing v. K-Mart* (1994), 257 Ill. App. 3d 759, at 764 the Court stated that the elements are:

"(1) words or conduct of the party whom estoppel is alleged, constituting either misrepresentation or concealment of material facts; (2) knowledge on the part of the party against whom estoppel is asserted that the representations were untrue; (3) the party claiming the benefit of estoppel must not have known the representations were false either at the time they were made or at the time they were acted upon; (4) the party estopped must either intend or expect that his conduct or representations will be acted upon by the party asserting estoppel; (5) the party claiming the benefit of estoppel must have relied or acted upon the representations; and (6) the party claiming the benefit of estoppel must be in a position of prejudice if the party against whom estoppel is alleged is permitted to deny the truth of the representations made. [Citations omitted.] Fraudulent intent is not necessary to estoppel."

Respondent has proven all elements constituting estoppel. The first two elements are met because Claimant intentionally concealed the fact that the topsoil quantity contained in the Schedule of Prices and in the Summary of Quantities was insufficient to complete the Warrenville Road Project and intentionally bid $23 per square yard for the topsoil knowing the topsoil was to increase by a factor of nine. The third element is met because the Department did not know of the discrepancy in the amount of topsoil necessary to complete this job. The fourth element is met because Claimant intended or expected that its concealment of the error in the topsoil quantity would be relied upon. The fifth element is met by the Department accepting the bid for $23 without

knowing the quantity of topsoil was insufficient by a factor of nine. The sixth element is met because Respondent will be prejudiced by paying approximately a half million dollars for one pay item which is one-fourth of the total contract price but which, in fact, is only a small portion of the project.

An unjust enrichment claim under Illinois law requires a showing that a defendant has unjustly retained benefit to the plaintiff's detriment, and the defendant's retention of benefit violates principles of justice, equity and good conscience. (*Schole v. Ames* (1994), 850 F.Supp. 707.) In the instant matter, Claimant would be unjustly enriched at the expense of the State of Illinois and Claimant's behavior violates the principles of justice, equity and good conscience. Claimant failed to advise IDOT of the discrepancy in the amount of topsoil necessary to complete the job and knowingly bid $23 a square yard to take advantage of the error. Further, Claimant proceeded to place more than eight times the topsoil without advising IDOT that it was going to do so.

Respondent argues that Claimant has failed to make a *prima facie* case for a contract loss. Respondent maintains that the Claimant's loss of $420,000 on the total project was incurred by losses on other pay items and such losses are not relevant. Respondent contends that Claimant did not sustain its burden of proof to establish that it had a loss as a result of topsoil placement.

Respondent rebuts Claimant's request for prejudgment interest and attorney's fees by stating that such will not be awarded absent a statute expressly allowing such recovery. *Centrola v. State* (1981), 41 Ill. Ct. Cl. 119; *Doe v. State* (1986), 40 Ill. Ct. Cl. 37; *A. J. Altman & Company v. State* (1994), 46 Ill. Ct. Cl. 56; and *Meade v. State* (1979), 33 Ill. Ct. Cl. 113.

## Claimant's Reply Argument

Respondent's construction of section 105.05 would render numerous provisions of the contract meaningless. In construing a contract, the ultimate goal is to discern and give effect to the intent of the parties as that intent is expressed or implied in fact to the contract taken as a whole. Since it is presumed that each provision of the contract was inserted deliberately and for a purpose, the intention of the parties will not be determined from isolated provisions of the contract. (*E. G. Martindell v. Lakeshore National Bank* (1958), 15 Ill. 2d 272.) In construing the contract documents as a whole, provisions which seem to be in conflict should be reconciled if possible. *J&R Electric Co. v. Edward P. Allison Co.* (1970), 125 Ill. App. 2d 123; *Agnell v. Illinois Bell Telephone Co.* (1950), 342 Ill. App. 516.

Final payment to Dunteman was to be based upon final quantities delivered to the site as measured in the field. Otherwise, section 102.04 Interpretation of Quantities in the Bid Schedule; section 109.03 Increased or Decreased Quantities; section 216.08 Basis of Payment of the Standard Specifications; and certain Special Provisions would be rendered meaningless.

During the course of construction, 121 of the original 174 pay items either increased or decreased in quantity. Fifteen new pay items were added and four pay items were deleted. Claimant's exhibit no. 3 shows that Dunteman's initial contract value of $2,010,848.15 fluctuated through quantity increases or decreases and the deletion or addition of pay items in the amount of $504,913.45. These additions and deductions do not include payments allegedly due for uncompensated topsoil. Each of these quantity increases or decreases were paid for in accordance with the sections set forth above, regardless of the financial impact upon Dunteman.

Under Respondent's construction of section 105.05, the engineer would now have the authority to adjust the unit price of 121 pay items to "fulfill the intent of the plans and specifications." Clearly, section 105.05 was never intended to govern such a circumstance but rather was intended to simply allow the engineer to complete the project as it was intended to be built by the owner. In this instance, section 105.05 authorizes the engineer to lay out the roadway and direct the contractor to construct the project within the engineer's layout (including the placement of topsoil) for which the contractor will receive an agreed-upon unit price already determined.

Respondent next bootstraps itself into an "apparent error" theory based upon the cross-section plans. Based only upon the inclusion of these plans in the contract documents, Respondent concludes that Dunteman had more accurate knowledge or should have had more accurate knowledge of the "apparent error" than either the developer (Corporetum), the owner (Village of Lisle), the engineer (Barton-Aschum), or IDOT. The mere fact that quantities can be calculated from the cross-section plans does not in itself create an apparent error. Obviously, it is the owner, through its engineer, who determines what shall be let for bidding. An owner simply may have other plans or resources available to it to perform certain portions of the work. Furthermore, it is readily apparent from the record that no one utilized the cross-section plans to verify topsoil quantities already summarized in the Schedule of Prices and Summary of Quantities.

Even the Department's expert, Richard Conklin, admitted on cross-examination that time constraints, bidding activity, and manpower impact a contractor's ability to verify an owner's quantities. He conceded that it would be a judgment call for the contractor as to whether or not to quantify every unit in a unit price contract and further

conceded that only significant items may be reviewed. Consequently, Dunteman was reasonable in relying upon the contract Schedule of Prices and the Summary of Quantities in the preparation of its bid. Dunteman did nothing to mislead or deceive the Department.

The record further discloses that the Department's field inspector resident engineer, George Karlis, failed to maintain a daily record of pay items placed in the field which would have allowed the Department to verify the nature and cost of changes in the plans and specifications. Respondent's assertion that Dunteman's superintendent should have realized that additional topsoil was being placed fails to recognize the duties and role the inspector resident engineer played in the project. It cannot do this without dismantling the mutuality of benefit and burden upon which unit price contracting depends.

It is well-settled that the Court of Claims does not have subject matter jurisdiction to hear affirmative matters based upon equitable claims or defenses. In *National Railroad Passenger Corp. v. State* (1983), 36 Ill. Ct. Cl. 265, the Court stated:

"The Court of Claims is not a court of general jurisdiction. Cases show that we have no authority to allow claims based on *quantum meruit*, that estoppel is no defense; that we are not a court of equity and cannot allow claims based thereon. We are referred to often times as a 'quasi-court.'

The legislature has granted this court authority to decide cases only in specific cases, and we must adhere to the limits imposed on us. This is a concession to the rule that the State, as a sovereign, cannot be sued.

In deciding our cases, we must decide them within the authority granted to us regardless of any harshness involved.

Were we authorized to consider equities, our holdings might be different in many cases, but we deem it beyond our authority to do so. The legislature has limited us in this regard.

In the case before us we are compelled to decide solely whether the statute of limitations has run since the accrual of the cause of action arose; we can give no credence to harshness nor to estoppel." 36 Ill. Ct. Cl. 265, at 266-67.

Clearly, estoppel is not available as a defense. Similarly, unjust enrichment, which is really nothing more than *quantum meruit* pled as a defense rather than as a cause of action, is an equitable defense. Also, either unilateral or mutual mistake require the rescission of a contract and a rescission of a fully performed contract is not available in the Court of Claims as this Court lacks subject matter jurisdiction. (See also *In re Application of Florence J. Ward* (1981), 35 Ill. Ct. Cl. 398 wherein the Court states: "* * * the doctrine of latches is an equitable defense and this court has steadfastly recognized that it does not have equitable jurisdiction.") More recently, the Court of Claims in *Wil-Fred's, Inc. v. State* (1989), 41 Ill. Ct. Cl. 44, stated that:

"The respondent, in its brief, asserts the defense that the Court of Claims has no jurisdiction over any claim predicated upon equitable doctrines, including promissory estoppel.

Promissory estoppel is an equitable doctrine offering relief where no legal remedy may be available. This court has held that it has no jurisdiction over claims sounding in equity. See *In re Application of Ward* (1981), 35 Ill. Ct. Cl. 398."

The current trend in the Court of Claims is to recognize that this Court is not a court of general jurisdiction which is empowered to consider the equities of a dispute. The Court of Claims has been granted authority to decide cases only in specific matters and this Court must adhere to the limits imposed upon it.

Assuming *arguendo* that the cases cited by Respondent are on point, they clearly do not follow the current trend in the Court of Claims' cases and have been superseded by cases cited by Claimant. *National Railroad Pasture Corp. v. State* (1983), 36 Ill. Ct. Cl. 265.

Assuming *arguendo* that this Court does have jurisdiction over the affirmative matters, Respondent still cannot prevail. Respondent's affirmative defenses allege "an

obvious scrivener's error" and a "clerical error" as grounds for rescission of the contract due to unilateral mistake of fact. Respondent relies upon a case entitled *STS Transport Service v. Volvo White Truck Corp.* (7th Cir. 1985), 766 F.2d 1089. The *STS Transport* opinion points out that three conditions must be fulfilled before a contract can be rescinded (766 F.2d at 1093):

"As the law now stands, three conditions must be fulfilled before a contract can be rescinded (1) a mistake must relate to a material feature of the contract; (2) it must have occurred despite the exercise of reasonable care; and (3) the other party must be placed in the position it was in before the contract was made."

In order for the affirmative defense of scrivener's error to succeed, Respondent must show that the topsoil quantity error contained in the plans and specifications occurred despite the exercise of reasonable care and that Claimant can be placed in the position it was before the contract was executed. Claimant was, in the aggregate, the low bidder on this project. Due to its completion of all pay items, including topsoil, Claimant has lost in excess of $411,183.35 over the course of constructing this project.

## The Law

The meaning of a written contract is ordinarily a question of law and not one of fact. In the absence of an ambiguity, the construction of the contract must be ascertained by the language utilized in the contract. (*Lenzi v. Morkin* (1984), 103 Ill. 2d 290.) The determination of whether an agreement is ambiguous is also a matter of law. *Touhy v. Twentieth Century-Fox Film Corp.* (1978), 69 Ill. App. 3d 508.

The rights and obligations of the parties are determined from the plain and unambiguous wording of the contract. Any ambiguities are to be construed against the Respondent as drafter of the contract. *Hoel-Steffen Construction Co. v. State* (1982), 35 Ill. Ct. Cl. 108.

The documents comprising the contract between the parties are specified on page A0000003 of joint exhibit no. 1B. This page is entitled "Contract" and bears the signatures of the agents of the parties. The page states that the Notice of Bidders, Special Provisions, Proposal, Contract Bond (hereinafter referred to as "Notice"), the Plans, and the Standard Specifications for Road and Bridge Construction are all essential documents of this contract and are a part thereof.

The Notice includes the statement that topsoil placement "will be paid for at the contract unit price per square yard * * * which price shall include furnishing and placing of topsoil." Section 216 of the Standard Specifications governs the methodology of topsoil construction (site preparation and placement). However, section 216 does not provide guidance towards resolution of the issue of contract construction. The primary question remains: Was the contract for 3,020 square yards or 27,180 square yards?

The bid proposal submitted by Claimant includes language that Claimant agrees that it "understands the quantities mentioned are approximate only and that they are subject to increase or decrease * * *." This same paragraph indicates that unit prices shown in the Schedule of Prices multiplied times the actual quantities equal the full payment.

Item no. 216003 of the Contract Schedule of Prices has a "TOPSOIL PLACEMENT 4" pay item description and indicates a quantity of 3,020 square yards. The proposal includes a statement that Claimant submits his schedule of prices and that he must show in the schedule the unit prices. Claimant submitted a unit price of $23 per unit with a topsoil projected price of $69,460.

Respondent moved for a directed verdict at the hearing of April 26, 1996, and continues in that motion in

its brief. The evidence, when viewed most favorable to the Claimant, does not so overwhelmingly favor Respondent that verdict for Claimant could never stand. *Pedrick v. Peoria and Eastern Railroad Co.* (1967), 37 Ill. 2d 494.

Based on all the evidence, the Court finds that the evidence clearly indicates that the contract as entered intended for Claimant to provide 3,020 square yards of topsoil at a price of $69,460.

The next question to be resolved is whether the contract unambiguously required 3,020 square yards or 27,180 square yards of topsoil. On this issue, Respondent asserts that Claimant had actual or constructive knowledge that the project required 27,180 square yards. It is clear that Respondent also had actual and constructive knowledge that the project required 27,180 square yards during the preparation of the plans and the design of the project. However, in order for the Court to find that there is a mistake or an ambiguity, one would have to conclude that even though Respondent, through its agents, had this knowledge, Respondent somehow divested itself of this knowledge. Respondent's conduct was such that one could reasonably conclude that the divestiture of knowledge, if such an event were possible, arose through Respondent's own negligence.

The Court finds that both Claimant and Respondent had actual knowledge that the project would use and the contract required approximately 27,180 square yards of topsoil. The time of this knowledge remains in question. When Claimant discovered this knowledge remains to be determined.

Respondent actually knew when it designed the project that approximately 27,180 square yards of topsoil were necessary. At the time of bidding, it intended to pay

$23 a square yard for 3,020 square yards. We must ask, did Respondent agree to pay the unit price of $23 a square yard for any topsoil above 3,020 square yards? Construing the documents against the drafter (and designer), the Court finds that Respondent did agree to so pay. In the event the Department had issued a stop oder after 3,020 square yards were placed, and prior to the placement of 21,266 square yards more, then the Court would give more weight to the State's argument.

The Court need not address the issues of balanced versus unbalanced bids. The parties generally agree that unbalanced bids are not *per se* unacceptable. In this instance, Respondent may have had the right to reject the bid because it was unbalanced, however, it did not and the issue is moot.

The case of *R. W. Dunteman Company v. The Village of Lombard* (1996), 281 Ill. App. 3d 929, is relevant to the instant matter. The *Lombard* case, like the instant case, involved a large variance between the estimated quantities stated in the subject contractor's unit price schedule and in the summary of quantities section of the plans for that job and the actual quantities. In the *Lombard* case, the plans show the estimated quantity for the work item "pavement removal" to be 330 square yards. The actual work entailed 16,525 square yards of pavement removal, a variance greater than that in the instant case.

In the *Lombard* case, the Village of Lombard claimed that since the plans and contract's estimate of quantities showed only 330 square yards of pavement removal work, R. W. Dunteman Company was only entitled to payment at the pavement removal rate for 330 square yards of pavement removal work and that all other pavement removal work performed should be paid at the

lower rate for the work item described as "special excavation." The Court summarized *Lombard*'s argument and R. W. Dunteman's response as follows:

"Finally, the Village contends that Dunteman is not entitled to the higher 'pavement removal' rate because, had it inspected the plans and examined the site, as provided in the contract, it would have discovered the conditions that led it to seeking the 'pavement removal' rate rather than the 'special excavation' rate. Specifically, the Village argues that it did not guarantee the accuracy of the plans at the time the work was put out for bids. Moreover, since Dunteman should have known through inspection the conditions of the jobsite, Dunteman cannot now complain about what it found.

Dunteman responds that the Village misunderstands the basis of Dunteman's claim. Dunteman does not claim that it was injured by the inaccuracy of the plans in this case. It is undisputed that this is a unit-priced contract, not a lump sum one, and the quantities listed were subject to change. The payment for work completed was based on actual quantities excavated * * *.

* * *

* * * The basis of Dunteman's claim is that it should be paid the '[pavement] removal' rate for materials they removed that fall under the contract definition of pavement removal materials. The fact that the contract the parties entered into provides for unit price and estimates, rather than fixed quantities, indicates that the amount and type of material to be removed were subject to adjustment based upon conditions found at the jobsite."

Based upon the foregoing analysis, the Appellate Court ruled that the magnitude of the variance between the plan quantities of pavement removal work and the actual quantities of such work was irrelevant. The Court ruled that R. W. Dunteman should be paid for all 16,525 square yards of pavement removal work that it performed at the pavement removal rate and not 330 square yards of work (the plan's estimated quantity for pavement removal work) at the pavement removal rate and the remainder of the work comprising pavement removal at a lower rate.

The *Lombard* case stands for the proposition that payment to a contractor under a unit price contract, such as the one at issue in this case, is governed by the unit prices agreed to and the actual quantities of work performed, not the estimated quantities. Further, the *Lombard* case indicates that variances between the estimated

quantities and actual quantities, even when the variances are as much as 4,907.57%, are immaterial.

In the instant case, the State's claim is predicated upon a quantity variance of nine times the estimated quantity. In the *Lombard* case, the quantity variance was greater than 49 times the estimated quantity. Nonetheless, the Appellate Court found the quantity variance to be irrelevant to the sum owed R. W. Dunteman under the contract.

Respondent argues that because Claimant was in breach of section 105.05 of the Standard Specifications, it is prohibited from recovering any monies under the terms of the agreement. Respondent further argues that Claimant's knowledge of the error and its failure to advise the Department is a breach of Claimant's implied obligation of good faith and fair dealing. Respondent also argues the equitable doctrines of estoppel and unjust enrichment.

Respondent, in support of its affirmative defenses, refers the Court to a sentence in section 105.05 of the Standard Specifications that states:

"The Contractor shall take no advantage of any apparent error or omission in the plans and Specifications, and the Engineer shall be permitted to make such corrections and interpretations as may be deemed necessary for the fulfillment of the intent of the plans and specifications."

Respondent clearly made an error by not placing the correct amount of topsoil needs on its Schedule of Prices. Respondent's engineer could clearly correct errors and make interpretations to fulfill the intent of the plans and specifications. However, this section does not permit the engineer to unilaterally decide to pay less per unit or to withhold payment for work already performed.

Respondent argues that Claimant's conduct is tantamount to fraud. However, no case law is provided to demonstrate that Claimant's conduct was fraudulent.

Respondent relies significantly on *Space Corp. v. United States* (1972), 470 F.2d 536 which reviewed a decision by the U.S. Court of Claims where a missing drawing in plans submitted by the United States to a contractor created an obvious omission or an ambiguity. The drawing would have shown a design that deviated from prior experiences in the industry and would result in a per unit price from $35 to $410. The Court in *Space Corp.* stated that a contractor who is faced with an obvious omission, inconsistency or discrepancy of significance, is obligated to bring the situation to the attention of the owner if he intends to resolve it in his favor. The case interprets federal law. The issue before this Court is whether section 105.05 of the Standard Specifications extends an affirmative duty on Claimant in the case at bar to notify Respondent of an inconsistency when the Claimant learns of the inconsistency.

Respondent also relies on *Maintenance Engineers, Inc. v. United States* (1960), 21 Ct. Cl. 553. *Maintenance Engineers, supra*, involved a situation where the pertinent terms, wherein an ambiguity was determined to exist, involved a fixed-price lump sum bid, not an indefinite per unit bid. The Court was deciding whether or not the contractor should be entitled to additional compensation for performing a greater amount of work than the work specified in the fixed price term.

Respondent has raised the issue that Claimant did not specifically notify Respondent when it started to place more than 3,020 square yards of topsoil and Respondent argues that the failure to notify Respondent prejudices Claimant's claim. However, the contract required delivery of approximately 27,180 square yards of topsoil and both parties had actual and constructive notice of the quantity and the parties contracted for the specific delivery of 3,020 square yards at $23 per unit.

Pursuant to these facts, Claimant was entitled to receive $69,460. Claimant already has received $62,063 for the topsoil delivered, therefore, $7,396.80 is owed to Claimant. Respondent also had its engineer on site for the time period that the topsoil was delivered and did not issue a stop order until 24,286 square yards had been delivered. Additionally, the contract, as a matter of law, required that approximate amount of topsoil. The final issue is whether or not Claimant should be paid $23 per square yard for 21,266 square yards, and if not, what is the appropriate amount, if any. The only other evidence of costs or prices for topsoil is $1.76 per unit as a national average and up to $4.50 per unit on the high side of the Department's estimates.

It is clear no mutual mistake, as that concept is used by our courts, has occurred in this case. A mutual mistake must involve a material or essential element of the contract and be a mistake shared by both parties. (*Beynon Building Corp. v. National Guardian Life Insurance Co.* (1963), 110 Ill. App. 3d 754.) In *Beynon, supra,* the court described mutual mistake as one in which the parties reached a good faith agreement, but due to error, the agreement is not accurately reduced to writing.

What this Court must determine is if section 105.05 of the Standard Specifications saves the Respondent from its own negligence in first writing the contract incorrectly and then not issuing a stop order until the work was substantially completed. The question can be posed as follows: In the event Dunteman knew the State inserted an incorrect figure for the amount of topsoil (square yards rather than cubic yards), can Dunteman remain silent and collect the greater figure? The closest case on the facts in the Court of Claims is *Agles v. State* (1980), 37 Ill. Ct. Cl. 134, in which the claimant believed, in an emergent situation, that he was a direct contractor with the State and not

a subcontractor who later was not paid because of an IRS lien on the contractor's bank. The State did not fully disclose its method of payment, which would have apprised the claimant of the State's belief that claimant was a subcontractor. In that situation, the Court reasoned that:

"[i]f there is a mistake in material fact with respect to a contract, and one of the parties knew or should have known of the ambiguity but did not disclose the ambiguity to the other party, the party that fails to disclose is bound by the mistaken party's interpretation. *Stone v. Those Certain Underwriters at Lloyds, London* (1980), 81 Ill. App. 3d 333."

On this basis, the Court awarded claimant the amount of his claim. In the case at bar, the Claimant/contractor knew of the State's error in the contract, but failed to disclose the error. This knowledge is imputed against the Claimant. Again, when Claimant learned of the error is crucial to our determination in this case.

Also, prior to rendering a final decision in this case, the Court must discuss one additional matter. Pursuant to the Court of Claims Act, 705 ILCS 505/12 states:

"Examination of Claimant. The Court or a commissioner may direct any claimant to appear, upon reasonable notice, before the Court or one of its judges or commissioners or before a notary and be examined under oath or affirmation concerning any matter pertaining to his claim. The examination shall be reduced to writing and be filed with the Clerk of the Court and remain as a part of the evidence in the case. If any claimant, after being so directed and notified, fails to appear or refuses to testify or answer fully as to any material matter within his knowledge, the Court or commissioner may order that the case be not heard or determined until he has complied fully with the direction of the Court."

We find that Allan Dunteman was the agent of Claimant most knowledgeable of the facts in the case and stood in the place of the corporate Claimant. A material issue in the case was Claimant's actual knowledge and the timing of that knowledge of the State's error in the contract, particularly in regard to the applicability of section 105.05 of the Standard Specifications.

During Respondent's case in chief, Claimant's employee, Allan Dunteman, failed to provide the Court with

relevant information regarding his knowledge as to the amount of the topsoil that his company thought was necessary to complete the Warrenville Road Project. Respondent's counsel inquired as to whether Claimant, indeed, had knowledge of the error but Claimant failed and refused to answer these questions even when ordered to do so by Commissioner Hanley. The transcript of testimony indicates as follows:

"MR. FALKOF: I'm going to object to the question, your Honor. There's no foundation for that at all. It has been clearly stated throughout and even today that the amounts that are in the estimated quantities are in fact that: estimated quantities.

The plans tell us how much topsoil is required. Mr. Shirmer told us plans are correct. We don't have any contest over what the plans show us. There is no foundation for that question at all, not based upon the testimony they elicited today.

THE COURT: I'm interpreting the question to be posed to this witness as whether this witness at the time he made his bid believed the—the factual matter included in the question to be such.

MR. FALKOF: That's not relevant. That is absolutely irrelevant to the issues before this Court.

As I said before, assume for the moment that he knew. Let's take that as an assumption for the moment.

That doesn't tell us whether or not the State has an equitable defense that it can raise.

It doesn't go to their equitable defenses, nor does it go to any damages that R. W. Dunteman would have suffered.

We are here today in part to make it absolutely clear to the Court of Claims that what goes on in the mind of a contractor at the time it prepares the bid, even in the case of an unbalanced bid, is not for the Court of Claims to later on inquire into. If he wants to make a little money, if he wants to raise the price on one item and lower the price on another item, if he wants to build in a profit on one item and not on another, that's up to him. That's not for the State later on to ask questions about in order to hammer him on what they're going to say.

So for those reasons we would strongly object to any questions which ask what was in the mind of this witness at the time that his bid was prepared.

THE COURT: Miss Schaffrick?

MS. SHAFFRICK: This is just going to his knowledge regarding the scribner's [sic] error regarding the amount of topsoil needed for this job.

THE COURT: I'm going to overrule the objection. And I do understand that Claimant can continue to argue this in its memorandum, that any testimony provided in response to this question is not relevant.

However, I'm going to allow the evidence to be presented.

MR. FALKOF: With all due respect to the Court, the R. W. Dunteman Company takes a position that we think is consistent with the law and which needs to be made absolutely clear in order to protect contractors who bid on State jobs.

We have instructed our client, Mr. Allan Dunteman, to not answer that question. As we are making that clear for the record today, that he will not answer that question.

Now, we realize that creates possibly a very unique dilemma to this Court, because normally a lawyer does not instruct his witness not to answer during a trial.

We have done the research to find out what would happen. There's nothing that gives us guidance in terms of what the Court should do today under these circumstances.

However, for guidance purposes, we did take a look at the rules which are developed which arise out of discovery. And the sanction which would derive from Illinois Supreme Court Rule 219 and from Federal Rule 37 is that where a witness during a discovery proceeding—and that's the only thing we have to work with here—refuses to answer a question and later on that question is found to be one that should have been answered, the Court may enter a sanction in the form of an order that states that the matters regarding which the order was made shall be taken as established for purposes of the action in accordance with the claim of the party obtaining the order.

So we fully understand that this court, in the event Mr. Dunteman does not answer that question, could well take the position that for purposes of this hearing it can be assumed that the R. W. Dunteman Company knew of the discrepancy between the plans and the estimate which is contained on the Summary of Quantities.

THE COURT: Madam Court Reporter, for my benefit would you read back the question that was posed to this witness.

MR. REIMAN: Could we read the question as interpreted by you?

THE COURT: Okay. Let's start with the question, and then let's go to my ruling after the question * * *

THE COURT: The grounds of the objection was relevancy; is that correct?

MR. FALKOF: That's correct.

THE COURT: Okay. I'm going to maintain my ruling. I'm still finding that the question is relevant. I believe that the parties can argue that such evidence does not prove or does prove any of the elements necessary for a party to demonstrate in order to prevail on an equitable theory.

I'm very well aware of the three-part elements necessary for mutual mistake in a rescission of the contract. But I believe the parties can argue that.

I am most concerned that the judges of this court may deem that question to be relevant. And in the event the judges which have the final say in this matter disagree with this ruling and believe it not to be relevant, then I think the whole issue does fly out the window.

However, I believe it's necessary for us to have a complete record that I ruled that the matter—that the question is relevant. I believe it to be relevant.

MR. REIMAN: Commissioner, we understand that. We want it made clear that we have instructed Mr. Dunteman not to answer the question.

I indicated during one of our pretrial conferences that there would likely come a point in these proceedings where we would draw a line in the sand; and this is that line.

MS. SHAFFRICK: Your Honor, I move for directed verdict.

THE COURT: I also understand Mr. Falkof's comments on behalf of claimant not to be an admission that this witness knew or did not know.

MR. REIMAN: That's correct.

THE COURT: And I want the record to be very clear on that. Mr. Falkof was only attempting to instruct and assist the court in determining how to construe the advice that's been provided to counsel—or to the witness and the impact of that advice or a nonanswer.

MR. FALKOF: That is correct.

MR. REIMAN: That is exactly correct, your Honor. We recognize that when an attorney directs his client to ignore a court order, something must be done and the appropriate remedies will be proposed; that the purposes of these proceedings, the Court can take the evidence in the light least favorable to the claimant.

THE COURT: I'm directing the witness to answer the question.

MR. FALKOF: And due respect, we have advised the witness not to answer that question.

THE COURT: Ms. Schiffrick [sic], you may proceed." R. 214-221. See exhibit B, pages of transcript.

Allan Dunteman was directed to answer a material question regarding the amount of topsoil and his knowledge of the error in the contract. This is a close case. The interaction of the contract language, contract defenses, and the application of section 105.05 of the Standard Specifications requires difficult decisions. The timing of Dunteman's knowledge of the error is crucial to the Court's final determination in this case. We are very mindful of the State's negligence in drawing the contract and failing to monitor the topsoil work and issue a stop oder as soon as the contract estimate was exceeded. However, truthful answers to the hard question regarding Claimant's knowledge of the error must be included in the mix to render a proper decision.

Therefore, pursuant to section 12 of the Court of Claims Act (705 ILCS 505/12), we find that Claimant's agent refused to testify and answer fully as to a material matter within his knowledge.

The Court has reviewed the record and finds that Claimant is not entitled to sanctions against Respondent.

Lastly, we find that Claimant is not entitled to attorney's fees as there is no statute allowing attorney's fees under the facts of this case.

Therefore, it is ordered:

A. That this cause shall not be determined until Claimant's agent, Allan Dunteman, complies with the order of Commissioner Hanley to answer all of the questions of Respondent.

B. That Claimant's motion for sanctions is denied.

C. That Claimant's request for attorney's fees is denied.

D. That the cause is remanded to the active docket of Commissioner Hanley.

E. That Claimant shall notify Respondent, the Commissioner, and the Court within 30 days of when Allan Dunteman will testify.

F. That in the event Allan Dunteman refuses to testify and answer all relevant questions, the cause will be dismissed for want of prosecution.

## SUPPLEMENTAL OPINION

FREDERICK, J.

This cause comes before the Court for a final determination of the issues raised by the Court's opinion filed

on January 6, 1999. Pursuant to the Court's order, the testimony of Allan Dunteman was resumed and completed on May 3, 1999, with Commissioner Hanley presiding.

The Court has carefully reviewed the testimony of Allan Dunteman and the affidavit of Ted Walschleger. In light of Mr. Dunteman's sworn testimony that he was not aware of the discrepancy in the contract at the time of the signing of the contract, we hesitantly must find that Claimant would be entitled to an award. Mr. Dunteman testified that at the time the bid was made, he believed that 3,020 square yards of soil were necessary. He further testified that he did not have knowledge of the discrepancy until some point after the soil was being delivered to the site. This testimony along with the other factors which were addressed in the Court's opinion sway the Court to find for Claimant.

Those factors are that IDOT's consultant, Barton-Aschum, correctly computed the soil needs on the project to be 3,020 cubic yards as shown on its calculation sheet. However, when the number was placed onto the Summary on the Plans, it was misidentified as 3,020 square yards. This summary was used by IDOT to prepare its schedule for unit bidding. This was negligence on the part of Barton-Aschum and it was negligence on the part of, or imputed to, the owner (IDOT) for not correcting the error.

IDOT also was aware that Claimant's bid of $23 for a square yard of soil was extremely out of line because they placed a red check mark next to it and IDOT personnel specifically discussed it before making the award. IDOT awarded the contract to Claimant because Claimant's total bid was substantially less than all others. Because IDOT's attention was brought to this item at bidding but before letting, IDOT had an opportunity to correct this pay item requirement but apparently did not sufficiently review this pay item and did not correct it.

Additionally, IDOT accepted all of the soil (3,020 cubic yards) then refused to pay for it. IDOT had personnel supervising the project, on and off site, and could have detected the discrepancy and stopped delivery.

Respondent argues that because Claimant bid substantially lower amounts for top soil on other projects and Claimant bid an exorbitantly high amount on this project for top soil, that the Claimant must have known that 3,020 cubic yards were needed for the project instead of 3,020 square yards. We do not accept Respondent's position. There could be various reasons why a bidder would bid so high for this or any particular pay item. Respondent's argument is in effect that IDOT would have been willing to pay an exorbitant amount of money for 3,020 square yards of soil but not for 3,020 cubic yards of soil. This argument is not accepted by the Court.

IDOT had actual knowledge of the soil requirements. Because of its own negligence, the schedule at bidding indicated a lower quantity of soil. Because of Respondent's negligence, even though the item drew special attention, IDOT did not correct the quantity and contracted for the soil at a specified per unit bid. IDOT then accepted the soil without correcting the quantity, discussing it with Claimant, or stopping delivery. They just refused to pay the per unit price to Claimant. There is considerable negligence on the part of the Respondent and/or its agent. This negligence does not provide a basis for refusing to make payment to Claimant.

This contract was prepared by Respondent. Based on all of the evidence, we find that section 105.05 does not save Respondent from its own negligence under the facts of this case as stated in the Court's opinion. Claimant is entitled to an award of $496,514.80. There is no basis upon which to order an award of attorney's fees or interest. Claimant is not entitled to attorney's fees or interest.

The Court further notes that Respondent has provided the Court with sufficient information to determine that sufficient funds lapsed to pay the award herein in full.

Prior to entering our judgment, we would be remiss if we did not state that in prior decisions of this Court, we have warned those entities doing business with the State that they cannot do business with the State on a handshake basis. Every "i" must be dotted and "t" crossed. Based on the facts of this case and the State court decision cited in the Court's opinion, the State should be forewarned to dot the "i's" and cross the "t's" when dealing with Claimant.

For the foregoing reasons, it is the order of the court that Claimant is awarded $496,514.80 in full satisfaction of its claim.

## ORDER

FREDERICK, J.

This cause is before the Court on Respondent's motion to reconsider and Claimant's response thereto.

It is hereby ordered that Respondent's motion to reconsider is denied. The Court's order of May 14, 1999 is affirmed.